934

COPPER LIQUOR, INC., and Harold Letcher (Robert Earl Basham, Jr., H. A. Anthony and Willis Ray Loving, as the personal representative of Appellee, Harold Letcher, substituted in the place and stead of Appellee, Harold Letcher, Deceased), Plaintiffs-Appellees,

v.

ADOLPH COORS COMPANY, Defendant-Appellant.

No. 73–3913.

United States Court of Appeals, Fifth Circuit.

Jan. 17, 1975.

Rehearing and Rehearing En Banc Denied March 17, 1975. See 509 F.2d 758.

Leo N. Bradley, Golden, Colo., William B. Browder, Jr., Midland, Tex., for defendant-appellant.

Vann Culp, Midland, Tex., James R. Warncke, San Antonio, Tex., for plaintiffs-appellees.

Before TUTTLE, WISDOM and GEE, Circuit Judges.

WISDOM, Circuit Judge:

■ On May 14, 1970, the plaintiff, Harold Letcher,[1] a retail liquor-store owner in Brownwood, Texas, brought this action under the Sherman Anti-Trust Act of 1890, §§ 1 and 2,[2] against the Adolph Coors Company. Letcher contended that Coleman Distributing Company, a Coors distributor, had refused to deliver Coors beer to him. At trial Letcher abandoned the claim under section two of the Sherman Act, and the court submitted the case to the jury only under section one. The jury found liability and assessed damages of $101,011. The trial court trebled the damages to $303,033, as it was required to do under 15 U.S.C. § 15,[3] and awarded attorneys' fees of $75,000.

The plaintiff's theory under section one of the Sherman Act is based on two interrelated contentions. First, Letcher contends that Coors conspired or combined with its distributors to fix the retail price of its beer and caused its distributor, servicing the plaintiff's retail liquor store, to discontinue the supply of Coors beer to the plaintiff when he sold below the suggested retail price and declined to give assurances that he would not do so in the future. Second, Letcher contends that Coors conspired or combined with its distributors to create and enforce exclusive territories within which each distributor was to conduct his business, making it impossible for the plaintiff to obtain a supply of Coors beer from another distributor once his original supply had been cut off. We hold that the plaintiff adduced sufficient evidence to show a violation of section one of the Sherman Act, but we remand the case for further proceedings (1) to determine whether the violation caused Letcher injury and, (2) if so, to determine damages in the light of the principles stated in this opinion.

## I.

The Adolph Coors Company, founded in 1873, an entirely family-owned business, is the fourth largest brewer of beer

---

1. Mr. Letcher died while the appeal was pending in this Court. The cause of action survives his death. Barnes Coal Corp. v. Retail Coal Merchants Ass'n, 4 Cir. 1942, 128 F.2d 645. A motion for substitution of his executors was allowed. The retail liquor store of which he became sole proprietor in January of 1966 experienced several changes treated fully in this opinion.

2. 15 U.S.C. § 1:
   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . ..
   15 U.S.C. § 2:
   Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

3. 15 U.S.C. § 15:
   Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

in the United States. All its brewing is done at a single plant at Golden, Colorado, a small town in a little valley in the foothills of the Rocky Mountains. The plant is the largest single brewery in the world. Coors is a "regional" brewer that markets its beer only in ten western states and half of Texas, unlike its three larger competitors, which have established "branch" breweries at various locations throughout the country and sell in all fifty states. Coors restricted its market area, in large part because of the process by which its beer is brewed. Coors is expanding its capacity at a rate of ten percent a year, all of it internally financed.

William Coors, the chief executive officer of the firm, testified as to the care taken in the brewing technique. The water used is nearby Rocky Mountain spring water that is remarkably free of microorganisms and organic matter. The flavoring agent for beer is hops; Coors imports a special German hop. There is no accounting for taste. But it is undisputed that this German hop imparts a flavor to Coors beer that, as Coors's witnesses testified, is "very characteristic and very delicate". The firm has developed its own variety of brewing barley, and maintains a staff of about fifty persons, some of whom are geneticists and agronomists, to supervise the production of the barley crop. To impart lightness to the beer, Coors dilutes the barley ingredients in the brew with a form of neutral starch obtained from a short-grain variety of rice of Asiatic origin that is twice as expensive as other varieties of rice available for that purpose. Mr. Coors concluded, "Coors beer is by a wide margin the most expensive beer made from the standpoint of the raw materials and the processing." According to his testimony, the brewing process at Coors takes about eighty days, as compared with forty days at the breweries of one of its three largest national competitors and twenty days at the breweries of another of the three national competitors.

Mr. Coors testified that Coors beer is brewed in an "aseptic" process, rather than by a technique employing pasteurization. In this process the firm employs refrigeration and rotation of stock so that beer past a certain age is removed from the marketplace. Special refrigerated railroad cars or other refrigerated vehicles are used in transporting the beer from Golden to the distributors, who must maintain the Coors beer in refrigerated warehouses and vehicles until it is delivered to the retailers. The retailers, in turn, are urged to keep it refrigerated until the ultimate consumer purchases it. Coors, its distributors, and its outlets maintain substantial efforts to reduce the exposure of the beer to light, heat, and agitation, for these factors have an adverse effect upon the flavor of the beer. Distributors have heavy responsibilities to maintain Coors's standards in this regard.

Coors limits its market to the states of California, Arizona, Nevada, Utah, Idaho, Wyoming, Colorado, New Mexico, Kansas, and Oklahoma, and to roughly the northern half of the state of Texas. This is about the same market Coors has enjoyed since the 1930's, after the repeal of Prohibition. Expansion of the firm is directed more toward increasing market penetration within areas already serviced than toward expanding the geographical area serviced. This policy is dictated by the centralization of Coors's brewing facilities. For example, the average shipment to the California market for Coors is thirteen hundred miles, while the average shipment of Budweiser in California is around one hundred miles. Coors beer is sold to the distributors at one price, f. o. b. Golden. Since the distributor pays the freight, the cost of shipment works a substantial practical limitation on the expansion of the market area. Moreover, Coors has experienced for many years a shortage of production capacity to meet the existing demand within the geographical area currently serviced by its distributors. Mr. Coors characterized market penetration within that area as crucial to the firm's survival. Since the beer is sold only in a limited area, a large amount of advertising expense is saved, so that per barrel the

firm spends on advertising only a quarter of what its major competitors spend. In part, this saving is made possible, as Professor Cundiff, Coors's marketing expert, testified, because Coors beer enjoys a high degree of customer loyalty and brand identification unusual, if not unique, in the beer market in the United States; and the savings, of course, help offset the transportation disadvantage.

Coors enters into distributorship agreements for certain geographical territory granting to the distributor a "nonassignable, non-exclusive, personal right to engage in the wholesale distribution of the company's beer products" within the described territory. The distributor promises to conduct his wholesale distribution exclusively within the prescribed territory. The agreement provides that either party may cancel the agreement without cause with thirty days' written notice, and that Coors may cancel the agreement "for any breach by the distributor" upon five days' written notice. Coors has such agreements with 160 distributors within its market area. A Coors distributorship is highly sought after; the company has about 7,000 applications on file. Mr. Coors testified that without the territorial restrictions imposed in the agreements, it would be difficult if not impossible to maintain the efficiency of the distribution system. Although one entering into a distribution agreement with Coors pays nothing for the right granted him, the distributor must make a substantial capital expenditure to establish refrigerated facilities for warehouses, trucks, and related equipment. Mr. Coors stated that unless the distributor could be assured that he would not be confronted with competition from another Coors distributor within his territory—assured that there would be no intrabrand competition—the distributor would be unwilling to make the necessary capital expenditure, and lending institutions would be unwilling to extend credit to him. Aside from difficulties intrabrand competition among distributors would create in attracting capital, Mr. Coors indicated that such competition, if permitted, would eventually erode the firm's market penetration. In the short run, so he said, intrabrand competition among distributors would primarily manifest itself in wholesale price competition and perhaps lower retail prices in competition in service. However, as time passed, the weaker of those who had been able to make the capital expenditure to undertake a nonexclusive distributorship would be eliminated from the competition, the "price" of competition would decline, and there would be a rise in the level of wholesale prices. In the long run, the effect of such competition on the smaller retail accounts would, he thought, be highly undesirable. Because there is almost always a shortage of Coors for the market area, the company allocates the supply with two primary goals: maintaining retail price stability and servicing the maximum number of retail outlets within the area with a supply as dependable as possible, so that consumer exposure and prompt stock rotation are promoted. Coors employs a computer to help balance its production capability with the inventory requirements of the distributors.

Mr. Coors and Professor Cundiff implied that in the earlier phrases of intrabrand competition, distributors would concentrate their efforts on the larger accounts to the detriment of the smaller accounts. They stressed that having more than one distributor responsible for a given geographical area would make it difficult for the company to monitor the treatment of the beer to ensure its proper refrigeration and rotation so that beer over sixty days old would be removed from the market. Additional problems arise in the case of draught beer, since it is the responsibility of the distributor to make sure that the draught facilities in retail establishments are properly cleaned and maintained. The flavor of beer is especially susceptible to deterioration if this responsibility is not meticulously discharged. Moreover, with exclusive distributorships, it is easier for the supplier to supervise compliance with

state statutes and rules regulating the sale of alcoholic beverages.

On the pricing policies of Coors there is, of course, conflicting evidence. Mr. Coors testified that the company occasionally suggests to its distributors both wholesale and retail prices to ensure to both distributors and retailers a fair return on their investment and effort. He stated that the company has no policy regarding dealing with retailers who sell Coors beer at a discount, but that from time to time the company and its distributors try to persuade retailers not to sell at a discount, primarily because a larger than usual volume of sales disrupts the orderly allocation of Coors's supply, which generally is less than the demand. Mr. Coors and other witnesses for the company denied that it had ever terminated or threatened to terminate a distributorship on any ground related to its pricing suggestions. They maintained that the company had no power to direct its distributors to deal or to refuse to deal with particular retailers, or to otherwise interfere with the relationship between distributor and retailer, and that the company did not do so. Its terminations of distributorships were based upon a breach of the agreement or upon poor performance within an assigned territory. It was not disputed, however, that the company's right to terminate the distributorship without cause on short notice was a formidable one because of the substantial investment in equipment primarily suitable for the distribution of Coors. There was evidence, sharply contested, that one distributorship in Texas, owned by a Mr. Dixon, had been terminated because the distributor refused to cut off the supply of certain retailers who had sold Coors at a discount. But there was also evidence that distributorships were held at the time of trial by individuals who had declined to abide strictly by the territorial limitations or to take any action to drive home to the discounting retailer the company's displeasure with the discounting. There was also evidence that from 1966 to the time of trial Coors beer was in fact advertised at a discount by retailers doing business in the general vicinity of the plaintiff's store in Brownwood, Texas.

Letcher acquired a sole proprietorship in the Brownwood store in January of 1966. About the same time, Coors entered the Brownwood market. Letcher advertised Coors at less than his own cost, using it as a "loss leader". Coleman, the distributor for that area, spoke to Letcher and to Mrs. Williams, an employee at the time, later a partner, and still later a shareholder in the business. She testified that Coleman said that he could not deliver any more Coors to them unless Letcher would promise not to offer it at a discount. Letcher refused to make that promise. Mrs. Williams testified that Coleman replied, "Well, it isn't my fault, I would like to sell you the beer but the brewery won't let me" and "I have a $100,000.00 investment here and I can't take a chance on losing it." There were some further deliveries after this exchange, but when Letcher again advertised Coors at a discount, the deliveries terminated, on June 3, 1966. Coleman resumed deliveries in August 1971, after Letcher had sold his interest in the store.

Coleman, on the other hand, testified that Letcher's advertising Coors at a discount had nothing to do with his discontinuing service to the Brownwood store. Coleman said that he did not get along well with Letcher on a personal level, that Letcher demanded a wholesale discount, that he did not give Coors adequate storage space, and that the beer was not adequately displayed to the customers. In these circumstances, he testified, he determined not to do business with Letcher. According to the records introduced at trial, Coors had no knowledge of Coleman's refusal to service Letcher until July 1966. Campbell, Coors's representative in that part of Texas and its liaison with Coleman, testified that he became aware of Coleman's refusal to service Letcher only after the initial termination in June of 1966, when Letcher wrote to the company to see if he could obtain a supply directly from

the brewery. He interviewed the two men individually. He found the source of the difficulty to be a difference of opinion as to how the beer should be treated at the retail store, colored by mutual dislike. He advised Letcher that he could not force Coleman to do business with him because Coleman was wholly independent in this respect. Business records Coors introduced into evidence, however, tend to support Letcher's version of the difficulties experienced with the distributor.[4] In a report to his superiors at Coors, Campbell noted, "I have suggested to Stuart Coleman to cooperate with Mr. Letcher if he shows interest in selling our beer at the right price."

## II.

■ The key case in determining whether Coors's system of distribution violated section one of the Sherman Act is United States v. Arnold, Schwinn & Co., 1967, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249. In *Schwinn,* the Supreme Court had before it a record, generated in a seventy-day trial, replete with "information as to the total market interaction and interbrand competition, as well as the distribution programs and practices [challenged by the Government]." 388 U.S. at 367, 87 S.Ct. at 1859. The distribution scheme in *Schwinn* was more complex than the one we have in the present case. Schwinn had instituted the practice of franchising retail outlets for its bicycles. The franchisees were free to sell other brands of bicycles, and to set their own prices for sales of Schwinn bicycles. They were forbidden to act as wholesalers or agents for unfranchised dealers. They obtained their wholesale supply of Schwinn bicycles from the wholesale distributor for their area. Schwinn established geographic areas, each of which was assigned exclusively to one wholesale distributor. Schwinn required the distributors to sell only to franchisees and forbade them to sell outside their territories. Schwinn sold directly to distributors. It also

---

**4.** For example, the report of Mr. Campbell, Coors' field representative, to his superior at the firm, dated August 20, 1966, reads in part:

> Bill Reed called me Monday morning and said that a Mr. Letcher (owner of the Handy Liquor Store in Brownwood) wanted to buy beer from him. Stuart Coleman, our Brownwood distributor, is not servicing Mr. Letcher because he has been advertising our beer at cut rate prices.

> I filled Bill Reed in on this situation, and Mr. Letcher was informed that Reed only had enough beer to supply the retailers he has been supplying.

His report of July 16, 1966, stated in part:

> One problem developed from a local liquor store which is cutting Coors prices and advertised same in the newspaper.

> Mr. Coleman stopped delivery to this retailer [Letcher] and the retailer wrote Golden a complaint claiming Mr. Coleman said it was a brewery policy and a Texas brewery rep said to stop delivering.

> I talked with this retailer about our thinking about retailers making a profit on our product. He, however, said he would still cut our prices on Coors and adv it in the newspaper just as he does the other beers he handles.

> I talked with Mr. Coleman and asked that he not use us as an escape route or

excuse but to precede [*sic*] on his own principles.

> I don't see any reason for Coleman to deliver to this retailer, however, until he is ready to stop these practices with our product.

His report of February 11, 1967, stated in part:

> As per Bob Eke's request, I stopped in Ballinger, Texas, and I talked with Mr. Harold Letcher. Mr. Letcher is the owner of the Handy Liquor Store in Ballinger and Brownwood. He has the stores which Mr. Coleman has not been selling in Brownwood because he is a price cutter. Mr. Letcher has written several letters to Mr. Coleman and letters to Mr. Eke stating his position in ordering beer. In my conversation with Mr. Letcher, he was very congenial, but he still feels he is right in his feelings that he has to treat all beers the same and when it comes our turn, he will advertise and cut our prices. He says he understands our beliefs, but he did not say what he plans to do.

> I have suggested to Stuart Coleman to cooperate with Mr. Letcher if he shows interest in selling our beer at the right price.

The record contains a number of similar exhibits with comments in the same vein regarding other retail accounts.

made "sales to retailers by means of consignment or agency arrangement with distributors" and "sales to retailers under the so-called Schwinn Plan which involves direct shipment by Schwinn to the retailer with Schwinn invoicing the dealers, extending credit, and paying a commission to the distributor taking the order." 388 U.S. at 370, 87 S.Ct. at 1861.

The *Schwinn* Court noted that in White Motor Co. v. United States, 1963, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738, the Supreme Court had refused to say whether certain exclusive allocations of territories and customers were *per se* violations of the Sherman Act; not enough was known of the competitive effect of the practices to justify departure from the usual application of the "rule of reason". The *Schwinn* Court prefaced its holdings by remarking that "we are remitted to an appraisal of the market impact of these practices." 388 U.S. at 373, 87 S.Ct. at 1862. The Court noted that in *White* it had cited cases of a new firm just entering a business or a "failing company" as instances in which the anticompetitive effect of vertical restraints is minimal or non-existent and therefore permissible under a rule of reason analysis, and that neither applied to the Arnold, Schwinn Company. The Court observed: "We are here concerned with a truly vertical arrangement, raising the fundamental question of the degree to which a manufacturer may not only select the customers to whom he will sell, but also allocate territories for resale and confine access to his product to selected, or franchised, retailers." 388 U.S. at 378, 87 S.Ct. at 1865. The Court

then drew a crucial distinction between "the situation where the manufacturer parts with title, dominion, or risk with respect to the article, and where he completely retains ownership and risk of loss." *Id.* Then the Court flatly stated: "where a manufacturer *sells* products to his distributor subject to territorial restrictions upon resale, a per se violation of the Sherman Act results. And . . the same principle applies to restrictions of outlets with which the distributors may deal and to restraints upon retailers to whom the goods are sold." 388 U.S. at 379, 87 S.Ct. at 1865. The rule of reason would apply, however, in a case where the manufacturer *retains* ownership and risk of loss because, said the Court: "we are not prepared to introduce the inflexibility which a per se rule might bring if it were applied to prohibit all vertical restrictions of territory and all franchising, in the sense of designating specified distributors and retailers as the chosen instruments through which the manufacturer, retaining ownership of the goods, will distribute them to the public. Such a rule might severely hamper smaller enterprises resorting to reasonable methods of meeting the competition of giants and of merchandising through independent dealers, and it might sharply accelerate the trend towards vertical integration of the distribution process." 388 U.S. at 379–380, 87 S.Ct. at 1866.

Whether a per se rule should attach to any sort of vertically imposed territorial restriction had been. a subject of debate among anti-trust specialists for some time before and after *Schwinn*.[5] But

---

5. For a view that would tolerate many types of market division, see Bork, The Rule of Reason and the Per Se Concept: Price Fixing and Market Division, 75 Yale L.J. 373 (1966). For a view that contradicts many of Professor Bork's tenets, and that suggests that most territorial divisions serve to enhance trends toward monopoly power, and to impede the efficient allocation of capital and other resources of society, see Comanor, Vertical Territorial and Customer Restrictions: White Motor and its Aftermath, 81 Harv.L.Rev. 1419 (1968).

For a paper that is more descriptive than argumentative, see Preston, Restrictive Distribution Arrangements: Economic Analysis and Public Policy Standards, 30 L. & Contemp. Probs. 506 (1965).

Vertically imposed territorial restraints have the obvious effect of reducing or eliminating intrabrand competition, whatever their effect may be on interbrand competition. Professor Comanor posits that firms manufacturing the same general sort of product will seek to insulate themselves from the effects of interbrand price competition by

the Supreme Court has not departed from its holding in *Schwinn.* If anything, the Court, in partial reliance upon *Schwinn,* has intensified the per se rule in the area of territorial restrictions. See, for example, United States v. Topco

"product differentiation", that is, by reducing the substitutability of their product and thereby diminishing consumers' sensitivity to price.

Advertising of course plays a large part in this process. In the present case, for example, Coors would have a powerful incentive to bring home to the consumer the real or imagined uniqueness of its product in order to decrease the consumer's tendency to respond to the lower price of, say, Schlitz. There is nothing unlawful in this; indeed, in cases brought under section two of the Sherman Act, the defense of "superior skill, foresight, and industry" has been recognized since the decision in United States v. Aluminum Co. of America, 2d Cir. 1945, 148 F.2d 416 at 430.

Sometimes product differentiation is achieved in part by strategies at the retail dealer level that increase the dealer markup. The refrigeration, the development of its special aluminum packaging techniques, and some of the other measures Coors insists upon, at least insofar as its distributors are concerned, would fall into this category of methods to increase product differentiation. In this connection, Comanor notes, "[s]ales by discount houses or other outlets where price is the major condition of sale are hardly likely to promote buyer·concern for the peculiar attributes of the products of a particular manufacturer," and are therefore viewed with disfavor by the manufacturer. 81 Harv.L. Rev. at 1427.

One obvious justification for territorial restrictions is that urged in the present case: that dealers on the wholesale and retail level will simply not make the capital investment required unless they can be assured of an absence of intrabrand competition and the greater risk it entails to capital investment. Just as obvious is the response that activities regarded most worthy of promotion by a society will offer prospective rates of return sufficient to attract the additional capital necessary, that risk is inherent in all capital investment to one degree or another, and that the most efficient allocation of capital resources may be achieved by eliminating restrictions that serve to insulate artificially a particular industry from competition.

Closely related to the investment argument is the argument that, absent the restrictions, there will be insufficient incentive for dealers to provide necessary services in relation to the product. The same counterargument based upon the necessity for the efficient allocation of economic resources applies.

Another justification frequently proffered, though not present in the case before us, is that vertically imposed restrictions are necessary to promote wider coverage of geographic markets. (Coors claims that its primary aim is to increase "market penetration" within existing geographical markets.) On the market coverage point, Comanor responds: "What is important is not whether these restrictions enhance market coverage or customer contact, for this they may well do, but rather whether restrictions of this character are likely to improve the competitive processes through which resources are allocated to these activities. While society generally approves of improved market coverage, it also generally deplores higher dealer markups and higher costs of distribution. Whether the additional gains are worth the additional costs, is of course, the essence of the problem of resource allocation—a problem whose solution we normally leave to the market place." 81 Harv.L.Rev. at 1431.

A further justification offered for vertically imposed restrictions is that without them, dealers would "invade" the territories of other dealers, seeking to take advantage of special sales efforts the local dealer has made in the form of advertising, provision of repair and other types of services and the like. However, many sorts of promotional activity that potentially redound to the benefit of any dealer in a given geographical area are usually undertaken by the manufacturer anyway (e.g., regional or national advertising), and those efforts that are undertaken by particular dealers (e.g., a liquor store advertisement in the local media advertising a "weekend special") are likely to be tailored to the local dealer and therefore difficult for the interloper to take advantage of.

But, it is argued, the existence of restrictions will be an incentive for the dealer to supply more "free" services, over and above those afforded by the manufacturer, than he would otherwise. One rejoinder to this is that there are, in reality, no "free" services; that they are, in effect, paid for out of the single price charged for the product, and that pricing them in this manner leads to further "product differentiation" and a concomitant increased tendency toward monopoly power for the manufacturer of the particular product in question. The alternative, of course, is obvious in the case of many sorts of products (but not the product involved in the present case): additional services provided on the dealer level should be charged for separately, and consumer demand will then more accurately determine the level at which and variety at which they should be applied.

Another justification sometimes advanced for vertically imposed restraints is that they

Assoc., Inc., 1972, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515. *Topco* involved territorial restraints that, though apparently primarily horizontal in nature, had strong vertical aspects as well. Topco Associates was an association of small and medium-sized supermarket chains organized to obtain merchandise under private labels, so that they might compete more effectively with larger chains. No member of the association was permitted to retail Topco brand merchandise outside the territory in which it was licensed to operate. There were similar restrictions upon sales at wholesale. The Court agreed with the finding of the district court that intrabrand competition in Topco brands would not be increased, and, in fact, the ability of the member chains to compete with the national chains might well be diminished by outlawing the challenged restrictions. The Court was not disposed "to ramble through the wilds of economic theory in order to maintain a flexible [as opposed to per se] approach". 405 U.S. at 610, 92 S.Ct. at 1134. Instead, the Court considered a judgment that competition with the national chains was to be favored at the expense of intrabrand competition was appropriate for Congress, not the Court, to make. It therefore held the territorial restrictions to be per se violations of the Sherman Act. Notwithstanding, Standard Oil Co. v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, *Topco* and *Schwinn,* read together, suggest that at this point we must accept the fact that the Court has set its face against both horizontal and vertical territorial restrictions, with the possible exception of vertically imposed restrictions by "new entrants" and "failing companies" briefly mentioned in *Schwinn.*

A number of lower federal courts have sought to escape this conclusion. Some have centered their efforts to distinguish the case before them from *Schwinn* by focusing their attention on the following observation of the Court:

> In any event, it is clear and entirely consistent with the District Court's findings that Schwinn has been "firm and resolute" in insisting upon observance of territorial and customer limitations by its bicycle distributors and upon confining sales by franchised retailers to consumers, and that Schwinn's "firmness" in these respects was grounded upon the communicated danger of termination.

388 U.S. at 372, 87 S.Ct. at 1862.

In Janel Sales Corp. v. Lanvin Parfums, Inc., 2 Cir. 1968, 396 F.2d 398, cert. denied, 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275, for example, the court refused to find a contract clause prohibiting sales of Lanvin products by its retailers "except to consumers for use", a per se violation because the evidence was conflicting with respect to whether the clause was enforced in a "firm and resolute manner", or enforced at all. At least one other court has required some evidence of enforcement of vertically imposed restrictions before holding per se violations of the Sherman Act. Colorado Pump & Supply Co. v. Febco, Inc., 10

---

facilitate price discrimination among various classes of customers. This seems indisputable, as does the assertion that they also facilitate price fixing on the retail level. The question is whether price discrimination (when it is legal at all) is a sufficient justification for the otherwise anticompetitive effect of vertically imposed restraints. Price discrimination itself implies that less competitive (higher) prices will be charged to some classes of customers. Moreover, the increased revenues possible through price discrimination are really available only to manufacturers already enjoying an "entrenched market position", and they tend to enhance monopoly power with no countervailing benefit to the consuming public.

Finally, it is sometimes argued that forward vertical integration will result if vertically imposed territorial restrictions are not allowed, and that such integration either (a) is somehow bad in and of itself, or (b) is uneconomical for the manufacturer relative to distribution through independent wholesalers and retailers. And of course there are the possible justifications, mentioned in the text, of the necessity of restrictions to promote new entrants or new products, or to promote safety when a particular product is subject to misuse.

Cir. 1973, 472 F.2d 637, cert. denied, 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965. In that case the court also stated that a mere designation in a contract of an area of primary marketing responsibility, without more, would not be a per se violation, following the suggestion of Plastic Packaging Materials, Inc. v. Dow Chemical Co., E.D.Pa.1971, 327 F.Supp. 213. This Court, however, has held that similar loose contractual designations and circumstances from which an understanding to adhere to the previous restrictions could be inferred, would constitute a per se violation. Hobart Brothers Co. v. Malcolm T. Gilliland, Inc., 5 Cir. 1973, 471 F.2d 894.

Even this group of exceptions to Schwinn would not help Coors's position in the present case. From our summary of the evidence it is apparent that, although there is some evidence that some distributors from time to time made some sales outside their territories, the jury's finding that Coors had been "firm and resolute" in enforcing the territorial restrictions is not contrary to the manifest weight of the evidence, and must be upheld.

There are, however, other cases potentially helpful to Coors in that they attempt to temper Schwinn's per se rule where the character of the product in question requires special safeguards in distribution. The outstanding example is Tripoli Co. v. Wella Corp., 3 Cir. 1970, 425 F.2d 932, cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62, a case involving customer restrictions. A long-standing distributor of beauty supplies, manufactured by Wella, distributed certain Wella products intended for use by professional beauticians to members of the consuming public. Wella refused to deal with the distributor. The Third Circuit affirmed a grant of summary judgment for Wella in a treble damage action brought against it by the distributor, noting that the customer restrictions were reasonably necessary to protect the public, since some of the products involved could cause serious physical injuries if not applied by properly trained personnel; the Schwinn per se rule was said to be inapplicable. Another example is the consent order in United States v. Safety First Products Corp., 1972 Trade Cases ¶ 74,223 (S.D.N.Y.1972), which permitted restrictions of sales of potentially dangerous fire protection equipment to "qualified persons" who met certain qualifications with respect to training, insurance, and experience.

The present case presents a tempting invitation. Tripoli suggests that we broaden the exception to Schwinn to products susceptible to damage in the distribution process unless that process is closely monitored. One may accept the testimony of witnesses of Coors that beer is just beer—unless it is Coors. But a great many products are good and popular. If an analog were sought to support such a departure from Schwinn, it could best be found in United States v. Jerrold Electronics, E.D.Pa.1960, 187 F.Supp. 545, aff'd, mem. 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961). In that case a tying arrangement, otherwise a per se violation of the Sherman Act, was permitted, because the services "tied in" with the sales of certain community television antenna equipment necessary to prevent malfunction of that equipment.

Assuming the validity of the Tripoli exception for the moment, we are unwilling to extend it to the facts of this case. The most important reason for our reluctance is that, whatever may be said of the efficacy of the territorial restrictions here in maintaining quality control, the restrictions also play a vital role in Coors's maintaining control over the wholesale and retail prices of its beer. Even if this element were not in the case, we think that the present record would not support the conclusion that the vertically imposed territorial restrictions are essential to the integrity of Coors's product to the survival of the firm. It may be that the process by which Coors beer is brewed necessitates refrigerated marketing and rotation of stock, and that vertical territorial restraints are helpful in supervising the

proper application of these techniques, as well as in facilitating "orderly" allocation of the limited supply of beer to Coors's market areas and ensuring compliance with state law. But there is not enough in the present record to demonstrate that these ends could not be met by less restrictive means than those presently employed.[6] Moreover, although Coors has made a good case for its contention that its special marketing techniques are necessary to maintain the quality of the product, it is likely that many manufacturers could make—and support—such claims to one degree or another. There is many a whiskey the quality of which is allegedly based on spring water and close monitoring by the manufacturer.

Any justification of restrictions on the ground of special techniques for manufacturing or supervising distribution should be premised on the absence of less restrictive means to assure the same control over quality.

It is true that Mr. Coors testified that it would be impossible to get people to undertake distributorships without the assurance that their distributorships would be exclusive within their respective territories. Yet the record does not support that conclusion, beyond the testimony of one distributor that he would not have invested in the distributorship had it not been exclusive. There is no showing that willingness to make capital investments in distributorships would be seriously impaired or that adequate measures to protect the product would not be taken if the distributorship were not exclusive. And, even if these were demonstrated, there remains the problem, so strongly emphasized in the Court's opinion in *Topco*, of determining the utility of decreasing competition in one segment of the economy in order to enhance it in another.

We do not say that vertically imposed territorial restrictions may never comport with the Sherman Act; *Schwinn* itself conceded they might be proper in the case of new entrants in a highly competitive field or "failing companies". *And there may be other exceptions.* We say only that this record does not, as a matter of law, provide justification for excepting Coors from the effect of *Schwinn*, in light of the price fixing evidence.

*Schwinn* may be subject to criticism. Indeed, it has been criticized.[7] We must

---

6. It is impossible for us to say, on the basis of this record, that there is or is not a less restrictive alternative than the exclusive territories to maintain adequate quality control. The manufacturer here has never experimented with nonexclusive distributorships, for example. In any event, the strong evidence that the restrictions in this case were used to forward an illegal price fixing scheme renders further consideration of this point academic at best. Without this evidence of price fixing, the case would be in a much more favorable posture for such consideration.

The question whether there exists an alternative less destructive of competition than the restrictions imposed by Coors in this case is, of course, a proper inquiry under the traditional rule of reason analysis (which we hold foreclosed to us on these facts), well summarized by Judge Davis in Carter-Wallace, Inc. v. United States, 1971, 449 F.2d 1374, 1381, 196 Ct.Cl. 35:

Conduct which can conceivably violate the Sherman Act may be examined in terms of three basic variables: (1) its economic effects, positive (furthering efficient performance of economic functions) and negative (anti-competitive impact on the free play of market forces); (2) the power of the parties in the markets which they serve; and (3) the motives underlying the conduct. A full rule-of-reason standard requires scrutiny of all three variables before a judgment is reached that a given practice is "reasonable" (permissible under the Act) or "unreasonable" (proscribed). A rule-of-reason inquiry may also eliminate examination of one or more elements, so that, for instance, anti-competitive effect will be assessed but motive excluded as immaterial.

7. See generally Handler, The Twentieth Annual Antitrust Review—1967, 53 Va.L.Rev. 1667, 1680–89; Pollock, Alternative Distribution Methods After *Schwinn*, 63 Nw.L.Rev. 595 (1968); Sadd, Territorial and Customer Restrictions After *Sealy* and *Schwinn*, 38 U.Cin. L.Rev. 249 (1969); The Supreme Court, 1966 Term, 81 Harv.L.Rev. 69, 235–39 (1967); Note, Restrictive Distribution Arrangements After the *Schwinn* Case, 53 Corn.L.Rev. 515 (1967); Note Territorial and Customer Restrictions: A Trend Toward a Broader Rule of Reason?, 40 Geo.Wash.L.Rev. 123 (1971).

bear in mind, however, that the Supreme Court's entire discussion of the distribution scheme in *Schwinn* was premised on the lack of evidence that the scheme was used to facilitate price fixing. The Court said:

> If it were otherwise—if there were here a finding that the restrictions were part of a scheme involving unlawful price fixing, the result would be a per se violation of the Sherman Act. United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238; United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024.

388 U.S. at 373, 87 S.Ct. at 1862. The restrictions Coors imposed necessarily facilitated price fixing.

In United States v. Colgate & Co., 1919, 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992, 997, the Supreme Court held:

> In the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell.

As we understand its position, Coors does not even rely on the *Colgate* doctrine insofar as its own actions are concerned. Rather, Coors urges that it had nothing at all to do with what happened between its distributor and the plaintiff, and implies that *this* conduct was shielded by *Colgate*. The *Colgate* doctrine operates within a narrow ambit, and does not immunize conduct that goes beyond a simple refusal to deal. The leading case limiting the scope of *Colgate* is United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505. In *Parke, Davis* the Court described the conduct that exceeded the limits of *Colgate* in the following terms:

> Parke Davis did not content itself with announcing its policy regarding retail prices and following this with a simple refusal to have business relations with any retailers who disregarded that policy. Instead Parke Davis used the refusal to deal with the wholesalers in order to elicit their willingness to deny Parke Davis products to retailers and thereby help gain the retailers' adherence to its suggested minimum retail prices. The retailers who disregarded the price policy were promptly cut off when Parke Davis supplied the wholesalers with their names. The large retailer who said he would "abide" by the price policy . . . was not cut off. In thus involving the wholesalers to stop the flow of Parke Davis products to the retailers, thereby inducing retailers' adherence to its suggested retail prices, Parke Davis created a combination with the retailers and wholesalers to maintain retail prices and violated the Sherman Act.

See also F.T.C. v. Beech-Nut Packing Co., 1922, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307; United States v. Bausch & Lomb Optical Co., 1944, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024; Albrecht v. Herald Co., 1968, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998.

■ The court correctly charged the jury that a conspiracy, combination, or agreement to fix prices was a per se violation of the Sherman Act.[8] There was evidence that would support a jury finding of such an agreement. There was testimony that a Mr. Dixon's distributorship had been terminated because he refused to "refuse to deal" with discounting retailers. There was evidence that Coleman refused to deal with the plaintiff because he felt constrained to enforce Coors's suggested retail prices. And there was evidence, chiefly in business records of Coors introduced at trial,

---

8. Two leading cases are United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, and Kiefer-Stewart Co. v. Joseph F. Seagram & Sons, Inc., 1951, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219.

that Coors's representatives were very attentive to wholesale and retail price levels. In the language of some of the reports, these representatives were quick to "suggest" to the distributors that they "take appropriate action" with respect to retailers who were not selling at the "right" price. A jury could reasonably conclude from these reports that the territorial restrictions have as much to do with Coors's attempts to maintain wholesale and retail price levels as with its concern with maintaining the quality of its beer on the market. Although we recognize that some form of territorial restrictions might be shown to be justified to protect a product unusually susceptible to damage in distribution, for example, or dangerous in the hands of the untrained, the restrictions here are too intimately related with practices within the per se proscription of *Parke, Davis*. The plaintiff therefore need not have alleged or proved a "public injury," as Coors contends. See Radiant Burners, Inc. v. Peoples Gas, Light & Coke Co., 1961, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358; Klor's Inc. v. Broadway-Hale Stores, Inc., 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741.

Our conclusion is strengthened by the fact that the Tenth Circuit has recently upheld a cease and desist order issued by the Federal Trade Commission against Coors, holding that there was substantial evidence to support the Commission's findings that Coors engaged in a conspiracy with its distributors to fix prices, that its territorial restrictions imposed upon its distributors were per se violations of the Sherman Act as interpreted in *Schwinn*, and that Coors used the termination provisions of its contracts with its distributors to enforce these anticompetitive policies. Adolph Coors Co. v. FTC, 10 Cir. 1974, 497 F.2d 1178. Perhaps uneasy with its holding on the territorial limitations point, the Tenth Circuit noted:

Although we are compelled to follow the *Schwinn per se* rule rendering Coors' territorial restrictions on resale illegal per se, we believe that the per se rule should yield to situations where a unique product requires territorial restrictions to remain in business. For example, speed of delivery, quality control of the product, refrigerated delivery, and condition of the Coors product at the time of delivery may justify restraints on trade that would be unreasonable when applied to marketing standardized products . . .
Perhaps the Supreme Court may see the wisdom of grafting an exception to the *per se* rule when a product is unique and where the manufacturer can justify its territorial restraints under the rule of reason.

*Id.* at 1187. We recognize the validity of the reasons underlying the exception the Tenth Circuit might engraft on the *Schwinn* rule. But the exceptions might engulf the rule itself. Many manufacturers may assert a claim of uniqueness with respect to their products, and in good faith believe that they would be "driven out of business" without the restraints in question. Coors itself in the present case has argued that it needs the restrictions to survive, yet the record shows that the firm is thriving, not struggling, that it is expanding at a rate of ten percent of capacity a year, and that its expansion is internally financed. The core facts of this case suggest caution in assessing a manufacturer's assertion that a marketing restriction with demonstrable anticompetitive effects is necessary to its "survival". At the very least, assuming such an "exception" to the per se rule were to be allowed, a manufacturer should be required to demonstrate, as we have noted, the absence of means less restrictive of competition to achieve the same end:[9] But we need pursue the question no further here.

9. For a recent case rejecting "considerations relating to quality control of the product [and shortages of the product]," advanced to justify enforcement of territorial restrictions similar to those involved in the present case, see Todhunter-Mitchell & Co., Ltd. v. Anheuser-Busch, Inc., E.D.Pa.1974, 375 F.Supp. 610, 622.

Coors's restraints were ancillary to an illegal price fixing scheme.

## III.

■ Before passing to the damage problems in this case, we must briefly address Coors's remaining contentions on the liability issue. Coors argues that it was necessary for the plaintiff here to allege and prove a combination or conspiracy involving the plaintiff's competitors. Whatever may be said of cases involving, for example, group boycotts, we think that a private suit based upon price fixing and territorial limitations enforced by a manufacturer and his distributors may be maintained by a retailer hurt by those practices without proof that other retailers who continued to do business with the manufacturer or distributor were part of an illegal combination. None of the cases relied upon by the parties confronts this problem directly, nor have we found any.

■ Some cases, however, such as Simpson v. Union Oil Co., 1964, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 and Lehrman v. Gulf Oil Corp., 5 Cir. 1972, 464 F.2d 26, support our conclusion that a retailer hurt by the practices complained of in this case may maintain a treble damage action. The plaintiff here has adduced evidence sufficient to support the jury's conclusion that Coors conspired with its local distributor to deny him their product, because he would not abide by their pricing policy, and that because of the territorial restrictions he was unable to obtain an alternate supply. The role played by other retailers in these practices should not affect the injured retailer's standing to sue, whatever other relevance that role might have to the case.

For a case suggesting that territorial restrictions are subject to the rule of reason if it could be shown that there were no "other practicable method of carrying on a prepaid insurance towing system," see Anderson v. American Automobile Association, 9 Cir. 1972, 454 F.2d 1240. However, the majority opinion noted: "If . . . the dominant

## IV.

■ Coors argues that the practices complained of did not occur in or affect interstate commerce. This contention may be dismissed largely upon the authority of Burke v. Ford, 1967, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554. In that case, the plaintiffs in a treble damage action sought review of dismissal of their complaint. The action had been dismissed, and the dismissal affirmed in the court of appeals, on the ground that the division of territories among the liquor wholesalers involved in that case did not occur in or affect interstate commerce, since the liquor "came to rest" in the wholesalers' warehouses before being shipped to the retailers. The Supreme Court held that the dismissal was improper:

Horizontal territorial divisions almost invariably reduce competition among the participants. . . . When competition is reduced, prices increase and unit sales decrease. The wholesalers' territorial division here almost surely resulted in fewer sales to retailers—hence fewer purchases from out-of-state distillers—than would have occurred had free competition prevailed among the wholesalers.

389 U.S. at 321–322, 88 S.Ct. at 444. Price fixing was not involved in that case, as it is in the present one. Moreover, the effects upon interstate commerce ascribed to horizontal division of territories in *Burke* are equally attributable to the vertically imposed restrictions in this case.

The record shows that Coors's shipments into the state of Texas are substantial—their value was around $20 million in 1970—and it cannot be said that Coors's policies respecting pricing and distribution of its products moving into

motive for the restrictive arrangements is to compensate the contract stations for unprofitably low towing charges by limiting competition for repair work on members' vehicles, the whole vertical arrangement may operate to unreasonably restrain trade in the automobile repair market." *Id.* at 1246.

the state do not have sufficient impact upon interstate commerce to bring them within the ambit of the federal antitrust laws. Coors says there is no effect upon interstate commerce because there is always a shortage of their beer and the amount shipped to Texas "is not a product of fluctuations in retail sales." Regardless of whether we accept the full import of this last statement in Coors's brief, we must reject the argument that the application of the federal antitrust laws turns on whether, if the illegal practices were halted, a change would occur in the volume of the product involved crossing the boundaries of the state in which the particular plaintiff does business, particularly where the practices are widespread and constant, rather than sporadic and wholly local in character. In any event, there is evidence in the record tending to show that the unavailability of Coors at a retail outlet led to a diminution in demand for other products on sale at that outlet that moved in interstate commerce. This impact on other products has been held to have a sufficient effect on interstate commerce to bring the case within the federal antitrust laws. Lehrman v. Gulf Oil Corp., 5 Cir. 1972, 464 F.2d 26, 34–36.

## V.

■ Coors has vigorously contended throughout this lawsuit that the cause of action asserted by the plaintiff Letcher cannot include any cause of action of the partnership composed of Letcher and Mr. and Mrs. Williams, nor of the corporation subsequently formed, of which the three individuals were the sole shareholders. The record shows that Letcher operated the retail liquor store in question from January 1, 1966, to January 1, 1967, as a sole proprietorship. On January 1, 1967, he sold a one-half interest to Mr. and Mrs. Williams, who had worked as salespeople in the store during the preceding year. Then, on September 1, 1967, the partnership was incorporated with Letcher and Mr. and Mrs. Williams as the sole shareholders. They operated the store from that date until July 17,

1971. The corporation was subsequently dissolved and its assets, apart from any legal causes of action against Coors, transferred to Mr. and Mrs. Williams, who reopened the store on August 14, 1971, and operated it as a sole proprietorship from that date to the time of trial. The legal causes of action against Coors were assigned to Letcher by an instrument dated April 13, 1972. The plaintiff also introduced into evidence a ratification signed by Mr. and Mrs. Williams reciting that they owned a one-half interest in the store as a partnership with Letcher from January 1, 1967, to the date of incorporation of the corporation, and that it was the intention of the partners that all assets of the partnership including legal causes of action were to become assets of the corporation. It further recited that Mr. and Mrs. Williams "ratify" the institution of the present lawsuit by Letcher and that neither of them had any further personal interest in the cause of action.

Relying on cases holding that an antitrust action may not be brought individually by a partner in a partnership nor by a shareholder of a corporation, Coors advances two primary objections to Letcher's standing to bring this suit. The first is that the "ratification" was ineffective to transfer the cause of action to the corporation, and that the partnership therefore should have been named as a party to the suit. Since by the time of trial the four-year statute of limitations had run on any claim that might have arisen during the existence of the partnership, Coors says, no damages may be awarded for any harm suffered by the partnership attributable to Coors's violation of the antitrust laws. Coors does not, however, specify in what respects the ratification was inadequate, nor does it suggest what the proper manner of transferring the cause of action would have been. Second, with respect to the assignment of the corporation's cause of action to Letcher, Coors argues that

in reality [the assignment] is not corporate action but merely signifies the

desires of two persons who happen to be on the Board of Directors of the corporation. . . . No certified copy of any resolution of the Board of Directors of the corporation accompanied said exhibit. Furthermore, there was no evidence whatsoever that the corporation ever did any business with a Coors distributor or that it ever requested and was refused Coors beer.

In our view, these objections, given the factual context of this case, seek to exalt corporate form over substance. All the testimony at trial, taken together with the "assignment" and the "ratification", would certainly estop Mr. and Mrs. Williams from ever bringing a suit against Coors on the same cause of action. We are dealing with a small retail outlet, owned and operated by three individuals over the period of time relevant to this suit, and in these circumstances we think that Coors must have been aware of the identity of the plaintiff and the genesis of his cause of action. There is nothing in the record to the contrary. There is no danger of exposure to multiple suits arising out of the facts here. Moreover, there is no demonstration of any other prejudice to Coors attributable to the failure—if there were a failure—to comply strictly with Texas law regarding the transfer of assets from one form of business organization to another or the ratification of corporate action. Though Coors's objections are grounded on this purported failure, its counsel did not examine Letcher or the Williamses, the only individuals owning or operating the store during the period in question, as to whether they complied with the formalities of the Texas corporation and partnership law, what their intent was in changing the corporate form, or pursue other lines of inquiry relevant to its objections. On these facts, we hold Coors's objections to the plaintiff's standing to sue to be insubstantial.

## VI.

■ Coors objects to the admission of certain statements of Mr. Coors describ-

ing the degree of market penetration the firm had achieved in its various marketing areas. This general sort of information was relevant to the cause of action alleged under section two of the Sherman Act. The section two claim was abandoned at trial. Coors now urges that the admission of this testimony prejudiced the jury. Because the relevant market had been designated as the market for beer in Brownwood, Texas, in the pretrial order (a designation we neither approve nor disapprove), the relevance of the challenged statements regarding market penetration in other areas is open to serious question, but, in light of the entire record, the substantial evidentiary basis for the jury's verdict, and considering the nature of the statements, we cannot say that admitting the evidence was so prejudicial as to require setting that verdict aside.

## VII.

■ Coors objects to the trial court's action in reopening the case before charging the jury to receive into evidence as an exhibit the "ratification" already discussed. We note that when Mr. and Mrs. Williams, who signed the challenged instrument, were on the stand, counsel for Coors did not delve into the irregularities now complained of in connection with the transformations of the store's corporate form from sole proprietorship to partnership to corporation and back to sole proprietorship. This failure, coupled with the absence of any showing of prejudice to Coors stemming from the irregularities, leads us to conclude that the trial court did not abuse its discretion in admitting the exhibit.

## VIII.

Coors complains that the trial court demonstrated a prejudicial attitude toward it. We dismiss this contention as insubstantial.

## IX.

This case is unusual in that the plaintiff is seeking damages because his sup-

plier cut off his supply of a product he had always sold for less than it cost him.

Between January 1, 1966, and June 3, 1966, the date after which no further deliveries of Coors were made,[10] Letcher testified that he sold roughly 1,000 cases of Coors at the Brownwood store, and that all Coors beer was sold at less than he paid the distributor for it. Letcher stated that he sold Coors below his cost, as a "loss leader", in order to attract business. Mrs. Williams testified that, after deliveries of Coors's were halted in June, 1966, the store experienced a decline in business. She said that customers, before the termination of service by Coors' distributor, would come into the store primarily to purchase Coors but would frequently buy other items as well, as a matter of convenience, and it was her impression that these customers no longer patronized the store after the termination. Coors's marketing expert disputed the accuracy of this recollection or impression. He stated that the market for beer and liquor items was very sensitive to variations in price, and that consumers often made purchases of different types of items at different retail establishments, depending on relative prices. Letcher and the Williamses testified that they experienced a loss on sales of all products at the store, and that, in order to compensate for the loss, they reduced their markup on all items, from an average of 25 percent to an average of 15 percent after the termination. Moreover, Mrs. Williams testified that, based upon her daily experience as a salesperson at the store, her opinion was that the "loss of markup profits" attributable to the termination was $75 to $100 per business day. She did not offer any facts in support of that conclusion, nor was "loss of markup profits" defined.

Most of the evidence relating to damages was presented by Dr. Dickson, the plaintiff's expert, and, because the jury returned a verdict for damages in the amount of $101,011, the exact amount of his estimated computation of "lost profits and good will", we must examine his testimony carefully. His testimony was based upon a rather limited store of business records tendered to him by the plaintiff, including the corporate income tax returns for the years in question, certain "operating statements" of a highly summary character, and certain receipts from the Coleman distributing concern. These items are all we have in the record. Dr. Dickson apparently based his testimony on certain other financial records as well that were present in the courtroom and examined by the defendant for the first time at trial. These further items contained certain bank statements, but what else they contained is unclear to us.

What is clear, however, from the testimony is that no accurate records of the sales for 1966, on an itemized product-by-product, daily or weekly basis or otherwise, were offered into evidence, nor were there any inventory records from which such a breakdown could be derived. That is, all products sold were lumped together, and Dr. Dickson testified that he analyzed sales *by looking at the gross bank deposit records* for the store. On that basis alone, he concluded that, because the bank deposits for June 1966 were $20,270, and those for July 1966 were $13,144, the termination of service by Coors' distributor cost the plaintiff the difference between the two sums. The difference was 53 percent of the lower figure, or, put another way, if one wanted to derive what the June deposits had been, one would multiply the July deposits by .53 and add that product to the July deposits.

---

**10.** The record shows that the store ran out of its supply of Coors on June 20, 1966, and Coors contends that if any comparison is to be made of bank deposits (and it denies this method is valid), that comparison should be of the thirty-day period before June 20 and the thirty-day period following. This suggestion may have some merit if we assume the bank deposits accurately reflect sales, but, as will appear in the text, we cannot make that assumption on the present record.

Coors, of course, strenuously objected to this part of the calculation, noting, first, that there were unusually large bank deposits made in the opening days of August 1966, and that if one averaged the deposits for the months of June, July, and August together, or, alternatively, included the early August deposits with the July deposits, there would be no discernable decline in "sales". Second, Coors objected to the *post hoc ergo propter hoc* brand of reasoning applied to the decline in sales, if there were any decline at all. There was, Coors says, no showing at all of any causal relationship between the termination and a decline in sales. There was, in fact, no actual decline in sales in the months after July 1966. Using though not approving the plaintiff's own measure of sales—bank deposits—, the exhibits demonstrate that the sales actually increased after the termination in June. The circumstance, coupled with the dubious character of the July "decline" in bank deposits, the fact that no records were introduced into evidence relating to daily or weekly sales on a product-by-product basis and the fact that by his own admission *Letcher sold all the Coors he ever purchased from the distributor at a loss,* raises serious doubt that Coors' violation of the antitrust laws caused Letcher any injury at all. We will return to this problem after tracing Dr. Dickson's thread of computations, as the jury apparently did, to its bottom line.[11]

Dickson assumed that by multiplying the actual bank deposits ("sales") by .53 and adding the product, he would arrive at a "gross sales" figure that would accurately reflect what the sales would have been had the termination of Coors not occurred. He then determined that the markup on goods sold was the gross sales minus the cost of goods sold, divided by the cost of goods sold. The strik-

11. The following equations, derived from the exhibits, may clarify the discussion in the text.

$$\text{Markup} = \frac{\text{Actual sales—Cost of goods sold}}{\text{Cost of goods sold}}$$

(Markup was derived for each fiscal period from 1966 through 1971)

Lost sales = .53 x Actual sales

(How the multiplier of .53 was derived is explained in the text.)

$$\text{Lost gross profits} = \text{Lost sales} - \frac{\text{Lost sales}}{(1 + \text{markup})}$$

Lost net profits = Lost gross profits — (sales taxes + inventory carrying costs + salaries)

(The record does not reveal how the figure of "inventory carrying costs" was derived.)

$$\text{Goodwill lost} = \frac{\text{Total lost net profits}}{\substack{\text{Total months of alleged} \\ \text{antitrust violation}}} \text{ x 12 x .78 x 15 x .14}$$

(The division by number of months' alleged violation and multiplication by 12 is to annualize the figure; the multiplier of .78 is to deduct "sales tax or corporate profits tax"; the multiplier of 15 represents, presumably, Dr. Dickson's judgment as to how many years in the future an antitrust plaintiff should be compensated for lost profits; and the multiplier of .14 is intended to reduce—the record does not show how or why—the figure already derived to its present value.)

ing difficulty with this formula is the computation of "cost of goods sold" for 1966, for Coors's expert in accounting testified that, based upon his study of the books tendered to Coors for the first time at trial, he concluded that they were incomplete; that "sales" were in fact bank deposits made; that there was no breakdown of the ledger into the traditional sections for capital, assets, liabilities, or inventory; that there was no accounting for cash on hand; and that the books, such as they were, did not balance. It is therefore difficult to see how an accurate "cost of goods sold" could be arrived at, at least on the basis of the present record.

Assuming, however, that the figure is accurate, Dickson computed the markup for 1966 as 20 percent. He proceeded to compute the markup for each successive accounting period through July 1971. He determined the "lost sales" for each period by multiplying the actual deposits by .53, and then he applied the markup figure derived for each period to the amount of "lost sales" to arrive at "lost gross profits". From this figure he subtracted the additional sales taxes, inventory carrying costs, and salaries that would have been incurred had the "lost sales" actually been made. This computation apparently made no allowance for the generally short supply of Coors or other exigencies. The result was "lost net profits". This figure, in turn, was used as a basis for computing "lost goodwill": it was translated into an annual figure, a 22 percent deduction for "sales tax or corporate profits tax," in Dickson's words, was made, and the present value of fifteen years' worth of the resulting "net lost goodwill" was added to the "net lost profits" for a grand total of $101,011.

Dr. Dickson offered an alternate method of computing damages, based upon "lost markup". · This computation started with the assumption that, after the termination of Coors's service, the markup decreased from 24 percent to 14 percent. Apart from the fact that this computation was apparently not relied upon

by the jury, in its assessment of damages, we do not think it merits extensive discussion here, because there is no adequate basis in the record for the assumption that the markup in fact decreased from 24 percent to 14 percent.

The general rules relating to antitrust damages are easy to state, but difficult to apply. It is said that, once a plaintiff in a private antitrust action has proved that the defendant violated the law and that this violation caused him injury in fact, the plaintiff is held to a less rigid standard of proof with respect to the actual dollar amount of his damages, because "economic harm is intangible and analysis of it is complex". "[A] wrongdoer should bear the risk of uncertainty that inheres in measuring the harm he causes". Note, Private Treble Damage Antitrust Suits: Measure of Damages for Destruction of All or Part of a Business, 1967, 80 Harv.L.Rev. 1566, 1572. See Bigelow v. RKO Radio Pictures, Inc., 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544.

In short, the record shows no support for the jury's finding of injury in fact attributable to Coors's policies of pricing and territorial restrictions. We are mindful of the deference due to the jury's findings. As this Court recently stated in Hobart Bros. Co. v. Malcolm T. Gilliland, Inc., 5 Cir. 1973, 471 F.2d 894, 902:

> The jury has the function of weighing . . . evidence. An appellate court should not substitute its own judgment unless there is a complete absence of substantial probative facts to support the jury's verdict, Lavender v. Kurn, 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946).

This record demonstrates such an absence of "substantial probative facts". There was evidence that daily sales records for the store were kept, yet none of Dr. Dickson's testimony was based upon them. Indeed, so far as we can tell, no effort was made to introduce them at

trial, and they were never made available to the defendant. Instead Dickson's entire computation of "lost net profits" was based upon a comparison of bank deposits made during the month in which the termination occurred and the month immediately following. His assumption that these deposits accurately reflected gross sales of all products for the periods in question is unsupported. Moreover, as we have emphasized, it is undisputed that Letcher sold every case of Coors obtained from the distributor at a loss. In order for his business to have suffered damage from the termination, the profits from the sales of other products in the store attributable to the presence of Coors as a "loss leader" not only must have been sufficient to make up the loss incurred in selling Coors but also have exceeded the profits on such products earned after the termination. Some of Dr. Dickson's testimony seems to be based on the assumption that Coors was being sold, and would have been sold in the future, at the same markup applied to all other products. This aspect of the case needs clarification on remand. A private treble damage plaintiff, in proving injury in fact, is not entitled to the benefit of the assumption that he enjoyed a markup on a product that in fact he sold at a loss.

We hold that on the record before us a finding of injury in fact could not be based on Dr. Dickson's comparison of bank deposits for June and July, 1966, or on the unsupported conclusion in the testimony of Letcher and the Williamses that they dropped the markup 10 percent after the termination. It is not within our province to say how much more evidence and what sort of evidence should be adduced on remand to prove the fact of injury. It is enough to say, in addition to the reservations we have already noted, that the record indicates that the business operated profitably after the termination of the Coors distributorship to the time of trial. When relative degrees of profitability are concerned, as opposed to the destruction of all or part of a going concern, there is no substitute for accurate sales records and inventory accounts. Isolated comparison of bank deposits or unsupported conclusions respecting markup advanced by the plaintiff just might be relevant, if accompanied by supporting relevant data.

If the plaintiff on remand can bring forward sufficient evidence to take the case to the jury on injury caused by the defendant, there are several methods of approximating the dollar amount of damages. There are two widely accepted methods. One looks to the degree of profitability of the injured business before and after the violation (and this was the one Dr. Dickson attempted to use in this case). The other looks to the profitability of a business entity as nearly identical to the injured business as possible except for the fact of damage attributable to an antitrust violation. See Lehrman v. Gulf Oil Corp., 5 Cir., 1974, 500 F.2d 659.

Proving injury in fact and proving damages are obviously similar tasks in an action of this nature. In neither undertaking did the plaintiff seek to introduce for purposes of comparison evidence of the performance of a retail firm similar to his own, except that it continued to have a Coors account. Moreover, it appears from the record that the store reopened as a sole proprietorship one month after Letcher sold his interest, and that it enjoyed the services of the Coors distributor from that time at least until the time of trial. An examination of the store's profitability after the resumption of Coors service would be relevant to the problems of proof on the issues of injury and damages.

Because the plaintiff faces a substantial hurdle on remand in proving injury, we need not dwell at length on every point raised by Coors in its attack upon the plaintiff's proffered computations of damages. Coors' point with respect to

the admission of Dr. Dickson's summaries from the business records of the firm is well taken. A proper foundation for many of his figures was not laid. On the most basic level, we are unable to tell from the present record just how Dr. Dickson arrived at his figures for "sales", "cost of goods sold", and several other figures that play prominent parts in his computations. There is, as we have said, reference in the record to a sales ledger or daily sales record, but this, unaccountably, was not advanced as a basis for Dickson's testimony. Further, although the record indicates that Coors was often in short supply, Dickson's computations made no attempt to take this into account in determining what the profits would have been but for the termination.

Coors objects to the inclusion of the element of goodwill (the term Dr. Dickson used for lost future profits after the store closed in July 1971, and Letcher disposed of his interest in it) on the ground that, in fact, service was resumed in August 1971, when the Williamses reopened it as a sole proprietorship. We regard it as an open question whether Coors's distributor would have persisted in his refusal to service the Brownwood store so long as Letcher owned an interest in it and declined to follow Coors's retail pricing policy. If so, (assuming· injury were demonstrated) loss of future profits would have been an appropriate element of damages. This is so even though the retail outlet itself continued to do business after the owner who refused to comply with illegal attempts to fix prices had sold his interest in the concern to others, presumably at a discount reflecting the loss attributable to his continuing antagonism to Coors's pricing policy. Evidence regarding the consideration for the transfer of his interest in the store to the Williamses would of course be relevant on the latter point.

Coors's contention that the jury should have been informed of the fact that actual damages are trebled under section four of the Clayton Act has been decided against it. Pollock & Riley, Inc. v. Pearl Brewing Co., 5 Cir., 1974, 498 F.2d 1240.

\*　　\*　　\*　　\*　　\*　　\*

The judgment of the district court is affirmed to the extent it is based upon the jury's finding of a violation of the antitrust laws on the part of Coors. We vacate the judgment insofar as it is based on the jury's finding of injury and its assessment of damages. We also vacate the court's award of attorneys' fees. We remand the cause for "further proceedings consistent with the views we have expressed, especially with regard to the determination whether Coors's violation of the Sherman Act caused injury to the plaintiff and, if so, the amount of the injury. If on remand, injury is proved and damages awarded, the district court may also award reasonable attorneys' fees.

Affirmed in part, vacated in part, and remanded.

GEE, Circuit Judge (concurring specially):

I concur fully in all portions of the court's opinion excepting Part II.

While I agree with the result reached in that part, I would, having decided that substantial evidence supports the verdict and judgment below that the vertically-imposed territorial restrictions were ancillary to price-fixing and that the restrictions thus were illegal per se, stop. "In those situations, it is needless to inquire further into competitive effect because it is established doctrine that unless permitted by statute, the fixing of prices at which others may sell is anticompetitive, and the unlawfulness of the price fixing infects the distribution restrictions." United States v. Arnold, Schwinn & Co., 388 U.S. 365, 375–376, 87 S.Ct. 1856, 1864; 18 L.Ed.2d 1249 (1967). Discussion of issues which might be raised in a pure territorial-allocation case is unnecessary to our decision.