### The SPERRY AND HUTCHINSON COMPANY, Petitioner,

v.

### FEDERAL TRADE COMMISSION, Respondent.

### No. 26739.

United States Court of Appeals, Fifth Circuit.

Sept. 29, 1970.

Samuel K. Abrams, Washington, D. C., J. Sam Winters, Austin, Tex., E. Smythe Gambrell, Harold L. Russell, Atlanta, Ga., for petitioner; Gambrell, Russell, Moye & Killorin, Atlanta, Ga., Clark, Thomas, Harris, Denius & Winters, Austin, Tex., Casey, Lane & Mittendorf, New York City, Morison, Murphy, Abrams & Haddock, Washington, D. C., of counsel.

James McI. Henderson, Gen. Counsel, John V. Buffington, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, Daniel H. Hanscom, Atty., Federal Trade Commission, Washington, D. C., for the Federal Trade Commission.

Before JONES, WISDOM, and COLEMAN, Circuit Judges.

COLEMAN, Circuit Judge.

The Sperry and Hutchinson Company ("S. & H.") seeks review of a cease and desist order issued by the Federal Trade Commission ("the Commission").

The litigation was initiated by a complaint, issued November 15, 1965, alleging that S. & H., in connection with its trading stamp business, engaged in unfair methods of competition and unfair acts and practices in commerce, in violation of § 5 of the Federal Trade Commission Act.[1]

Upon hearing, briefs, and argument, the Hearing Examiner filed his initial decision February 10, 1967. He held that business practices of S. & H., including the prevention of trafficking in its stamps, were lawfully essential to the Company's services and that the charges relating to business practices of S. & H. acting alone were not supported by the evidence. He sustained those portions of the complaint dealing with alleged combinations or conspiracies with retailers or other trading stamp companies.

---

1. Section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45, provides in pertinent part:

Section 5(a) (1): "Unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce, are declared unlawful".

Section 5(a) (6): "The Commission is empowered and directed to prevent persons, partnerships, or corporations * * * from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce".

The Commission sustained the Examiner's findings as to alleged combinations and conspiracies but rejected his findings as to S. & H.'s unilateral practices. In short, the Commission sustained all of the charges in the complaint.

Portions of the order entered under Count III of the complaint directed S. & H. to cease and desist from preventing persons from trafficking in its trading stamps. S. & H. was also ordered not to institute suits to enjoin such trafficking and to notify traffickers that injunctions presently in effect in state and federal courts would not be enforced.

S. & H. urges that these portions of the order (relating to Count III) be vacated. We are of the view that the petition should be granted.

### The Business of S. & H.

Sperry and Hutchinson is the oldest, and by far the largest, trading stamp company in the United States. It has been engaged in the trading stamp business for over seventy years. By 1964 it accounted for about 40% of all trading stamp volume in the United States.[2] Approximately 60% of all households in the Nation save S. & H. "Green" stamps. This percentage amounts to at least 35 million American families.

S. & H. issues its stamps to approximately 55,000 licensed retailers, who then dispense the stamps from over 70.-000 stores throughout the Country. In 1964, S. &. H. issued over 140 billion stamps to these retail licensees. The retail merchants then gave out the trading stamps in connection with sales of ten to fifteen billion dollars worth of goods and services.

S. & H. licenses the use of its trading stamp service to retailers engaged in almost every type of retail business conducted in the United States.[3] The licensee then issues the stamps, usually on a purchase volume basis, to those members of the public buying the particular type of goods or services offered for sale.

After filling at least one book containing 1200 stamps, a stamp saver may present them to S. & H. for redemption in merchandise. In certain states stamps may also be redeemed in cash, but during 1965 such cash redemptions represented less than 1% of the total redemptions made by S. & H. in those states.

S. & H. maintains more than 850 redemption centers located throughout the Country. Of these, approximately 750 maintain inventories of merchandise from which redemptions can be made immediately. The remainder, many of which display samples of merchandise items, accept orders which are filled within a few days by one of S. & H.'s nine distribution centers.

S. & H. redemption merchandise is of high quality, is made by well known and reliable manufacturers, and is carefully selected with a view to meeting consumer desires. S. & H. goes to substantial expense to keep its redemption merchandise updated to meet current consumer demands.

The purpose of S. & H.'s service is to enable its licensees to increase and to maintain their sales by attracting customers and inducing those customers to return, again and again, until they have collected enough stamps to secure the redemption articles of their choice.

2. The five largest stamp companies besides S. & H. are Top Value Enterprises, Inc., issuing "Top Value" stamps, Gold Bond Stamp Company, issuing "Gold Bond" stamps, E. F. McDonald Stamp Company, issuing "Plaid" stamps, King Korn Stamp Company, issuing "King Korn" stamps, and the Blue Chip Company, issuing "Blue Chip" stamps. In 1964, these companies represented between 43 and 48 percent of the stamp industry's volume.

3. In 1966, S. & H.'s two leading customers were supermarkets and other food stores dispensing about 62% of S. & H.'s stamps, and gasoline stations dispensing about 21%.

### The Traffickers in Stamps

Trading stamp exchanges are businesses which, for a fee, will exchange the stamps issued by one company for those issued by another. Some retailers have attempted to acquire S. & H. stamps from some source other than S. & H. in order to issue them to their own customers. Some have offered to exchange S. & H. stamps for the stamps they were issuing or to accept S. & H. stamps in partial payment for their own goods or services. These retailers and the stamp exchanges are traffickers in S. & H.'s stamps.

Trading stamp exchanges also purchase and sell various trading stamps outright. The purchase of stamps from exchanges occurs when a consumer does not have enough stamps to redeem the merchandise she desires. The sale of stamps also occurs when a stamp saving consumer wants cash rather than any of the redemption merchandise offered by the company whose stamps are sold.

Usually the customer of an exchange simply wants to exchange one type of stamp for another. This type of exchange normally occurs when the consumer has accumulated a quantity of stamps not of the type she principally collects. She then desires to exchange the different varieties of stamps she possesses for a single variety in order to increase her choice of merchandise items or to acquire a particular item for which she had insufficient stamps prior to the exchange. This exchange service costs an exchange charge or "commission fee", of from twenty five cents to fifty cents.

S. & H. asserts that if a housewife can obtain S. & H. stamps from an exchange or an unlicensed retailer she will not have the same incentive to patronize S. & H.'s licensee's that she would otherwise have if their stamps were obtainable only from them. Therefore, the S. & H. system of promoting retail merchandise would become less attractive to a prospective or present licensee and S. & H.'s business would be materially injured.

Whenever S. & H. has learned of unauthorized trafficking in its stamps it has uniformly sought to stop the practice. The procedure normally involves, first, a letter written by the company's attorney to the trafficker telling him that he is trespassing upon S. & H.'s rights and informing him that S. & H. intends to seek an injunction if he does not desist. S. & H. supplies citations to the legal authorities which have unanimously supported its position, with the hope that the trafficker will voluntarily discontinue the unauthorized use. If the trafficker persists it is the practice of S. & H. to seek an injunction.

From 1904 to 1966, S. & H. was involved in forty three actions in eight federal districts and nineteen states to enjoin the unauthorized use of trading stamps. Each of the forty three cases resulted in an injunction against the defendant.

Four states have statutes prohibiting, in one way or another, the issuance or redemption of trading stamps without the consent of the trading stamp company that originally issued the stamps.

### The Law

The Federal Trade Commission Act, 15 U.S.C.A. § 45, empowers the Federal Trade Commission to prevent unfair methods of competition in commerce. The Sperry and Hutchinson Company claims that the Commission has exceeded its authority in the issuance of the order now under review.

The Commission determined that S. & H.'s resort to the courts to eliminate trafficking in its stamps substantially reduced the volume business of the exchanges and that these actions constituted "unfair methods of competition in commerce and unfair acts and practices in violation of § 5". This finding being subject to review,[4] we are compelled to disagree.

4. See Federal Trade Commission v. Brown Shoe Company, 384 U.S. 316, 320, 86 S.Ct. 1501, 16 L.Ed.2d 587.

■ The traffickers in S. & H. stamps have been enjoined forty three times by state and federal courts. This court action has no doubt injured the businesses of the traffickers. However, the Commission cannot rest its case solely on the determination that injury to a competitor exists.

■ To be the type of practice that the Commission has the power to declare "unfair" the act complained of must fall within one of the following types of violations: (1) a per se violation of antitrust policy;[5] (2) a violation of the letter of either the Sherman, Clayton, or Robinson-Patman Acts; or (3) a violation of the spirit of these Acts as recognized by the Supreme Court of the United States.

There is no per se violation, or violation of the letter, of the antitrust statutes in this case. The remaining question then is: Have the activities of S. & H. violated the spirit of the antitrust statutes? We think not.

■ In Atlantic Refining Company v. Federal Trade Commission, 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965), the Supreme Court made it clear that, in determining when § 5 may be applied to conduct which does not specifically violate the existing antitrust laws, the Court means conduct which bears "the characteristics of recognized antitrust violations".

In Federal Trade Commission v. Brown Shoe Company, 384 U.S. 316, 86 S.Ct. 1501 (1966), a case relied on heavily by the Commission, the Supreme Court significantly broadened the reach of § 5. However, the Court simultaneously limited the restraining power of the Commission to conduct of corporations which bear "the characteristics of recognized antitrust violations". The

Court said, at page 322, 86 S.Ct. at page 1504:

"We reject the argument that proof of this § 3 [Clayton Act] element must be made * * * our cases hold that the Commission has power under § 5 to arrest trade restraints in their incipiency without proof that they amount to an outright violation of § 3 of the Clayton Act or other provisions of the antitrust laws. This power of the Commission was emphatically stated in F.T.C. v. Motion Picture Adv. Co., 344 U.S. 392, at pp. 394–395, 73 S.Ct. 361, 363, 97 L.Ed. 426:

'It is * * * clear that the Federal Trade Commission Act was designed to supplement and bolster the Sherman Act and the Clayton Act * * * *to stop in their incipiency acts and practices which, when full blown, would violate those Acts* (emphasis ours) * * * as well as to condemn as "unfair methods of competition" existing violations of them'."

■ Competitive practices need not be specific, established violations of one of the existing antitrust laws to be "unfair" within the meaning of the Federal Trade Commission Act. However, the practice complained of must be more than a mere restraint of competition. It must be a practice "which when full blown would violate those acts" or one which has "the characteristics of antitrust violations".

The Congress could not have intended to vest the Commission with such broad discretion as to allow it to label a restraint "unfair" without applying some judicial guidelines in making their findings. The Commission should at least determine that the practice violates the policy or spirit of the antitrust law. If

---

5. Justice Black in Northern Pacific Railway v. United States, defined a per se violation: "[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use". 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

it does not, then the Commission casts itself in the form of a legislative body.

Considerable importance should be given to the fact that while permitting a small group of businessmen to operate a business the legality of which has been rejected by the Courts the Commission order would itself restrain competition between S. & H. and other stamp companies.[6] The order would make all stamps interchangeable and would reduce as against other trading stamp companies the effectiveness of S. & H.'s competitive tools, such as its nationwide coverage and the high merchandise value of "Green" stamps. Such restructuring of an industry to eliminate legitimate competitive distinctions and to reduce all competitors to a common level is exactly what the Supreme Court condemned in Federal Trade Commission v. Sinclair Refining Company, 261 U.S. 463, 475, 43 S.Ct. 450, 464, 67 L.Ed. 746 (1923).

> "The powers of the commission are limited by the statutes. It has no general authority to compel competitors to a common level, to interfere with ordinary business methods or to prescribe arbitrary standards for those engaged in the conflict for advantage called competition. The great purpose of both statutes [7] was to advance the public interest by securing fair opportunity for the play of the contending forces ordinarily engendered by an honest desire for gain, and to this end it is essential that those who adventure their time, skill, and capital should have large freedom of action in the conduct of their own affairs."

Although fairly challenged to do so in S. & H.'s main brief, the Commission has been unable to point to any antitrust law which S. & H. has violated either in letter or spirit. This Court must hold that the efforts of S. & H. to prevent that which time and time again has been declared unlawful do not constitute practices of the type that transgress the spirit of the antitrust laws and consequently the Federal Trade Commission's cease and desist order exceeds it statutory authority.

The petition for review is granted and the order of the Commission is set aside.

So ordered.

WISDOM, Circuit Judge (dissenting):

By this decision the Court blesses unfair, anti-competitive practices against three groups. First, the Court approves practices by trading stamp companies that eliminate a whole class of small businessmen—those who operate trading stamp exchanges. Second, the Court denies to independent retailers, competing with S & H licensed retailers, freedom to use the effective competitive tool of offering *their* goods and services for trading stamps. Third, the decision deprives housewives and other consumers of the competitive effects and useful services provided by the exchanges and by retailers (both licensed and unlicensed) who redeem stamps.

Trading stamps are a substantial competitive force in the marketplace, an integral and important aspect of retail distribution in the United States, especially in food retailing.[1] In many areas the

---

6. The Commission determined that trading stamps are "a viable means of competition at the retail level" and "have become an integral and important part of retailing in America". This accorded with the finding of the examiner that "in the issuance of its complaint, the Commission took pains not to attack the trading stamp business as such".
   Upon the basis of exhaustive analysis of the evidence of record and personal observation of the demeanor of the witnesses, the Examiner concluded that seri-

ous damage would be visited upon S & H through commercial trafficking in S & H stamps and that the action of S & H alone in stopping that activity was inherently essential to the conduct of the trading stamp business.

7. The Federal Trade Commission Act and the Clayton Act.

1. In 1964 S & H issued 140 billion stamps for which licensed retailers paid $322,296,000. The retailers gave S & H trading stamps in connection with sales of

retail grocery stores using trading stamps dominate the market.[2] The Court's decision, therefore, will tend to increase the dominant position of those stores to the detriment of competing retailers and to the detriment of consumers on whom ultimately falls the burden of paying for trading stamps.[3]

The Commission concluded that between 5 and 14 percent of S & H stamps are never redeemed.[4] The right of consumers to transfer and sell stamps at stamp exchanges and the right of independent retailers to redeem stamps would reduce this economic waste. In addition, the existence of stamp exchanges

ten to fifteen billion dollars worth of goods and services. About 60 percent of all households in the nation save S & H "green" stamps.

In 1964 trading stamps of all companies were issued in connection with annual sales to the consuming public of about $40,000,000,000.

2. The Commission found:

In a number of metropolitan areas stamp dispensing by supermarkets accounts for a major proportion of the retail food business. Twelve supermarket chains accounted for a third of respondent's revenue of 1965, all of which became customers since the 1950s. The following are some of the markets in which stamp dispensing supermarkets account for over 70 percent of retail food volume: Dallas, Fort Worth, 97 percent; Miami, 79 percent; Albany, 78 percent; Jacksonville, 77 percent; Sale Lake City, 86 percent; Little Rock, 79 percent; El Paso, 72 percent.

3. Trading stamp companies contend that the cost of stamps are absorbed by the licensed retailers who do not raise prices but hope to profit from an increased volume of sales. In 1966 the average price paid by retailers for stamps was $2.23 for 1,000, or 1¢ for about 5 stamps. S & H charges a comparable amount, $2.70 for a book of 1,200. This is 2¼ percent of the sales on which stamps are given.

On the other hand: "A substantial number of retailers admit that they cannot offset the costs of stamps at all except by passing the cost on to the consumer in the form of higher prices.

"Should the retailer wish to abandon the stamp plan rather than raise his prices, he is faced with some difficulty, for once his customers have begun to save stamps they will not want to stop before they have acquired enough stamps for redemption. This makes it virtually impossible for the retailer to stop giving stamps without losing business. Therefore, when the retailer's market area reaches the point of trading stamp saturation, continued membership in the stamp plan does no more than allow the retailer to meet competition. If he withdraws from the stamp plan, he will stand to lose business. If he continues to give stamps, he will have to raise prices and thereby antagonize his customers. All the retailers in the area, being faced with the same choice, will probably raise prices. In 1958, when only seven out of ten leading supermarket chains were giving stamps, a study by the Department of Agriculture showed that prices in stores which gave stamps were at least six-tenths of one per cent higher than in stores which did not give them. Today, with trading stamp saturation in many areas, it is probable that this figure has become more substantial.

"*The Consumer.*—The housewife cannot decline to save stamps; she is virtually forced to do so. If she does not, the buyer who shops at the same store and does save stamps will be paying lower prices for the same purchases. Thus, in order to take advantage of the lowest possible prices, the housewife must submit to the collecting of trading stamps. Moreover, she must choose stores by the kind of stamps they give, for few people will find it profitable to save more than two types of stamps.

"Even if a consumer decides to collect stamps and pay the resulting higher prices, she may not be getting the promised value upon redemption. Stamps are redeemed in some states in either cash or merchandise at the option of the holder. Under these circumstances, the cash redemption value is always much lower than merchandise redemption value. * * *" Comment, Trading Stamps, 37 N.Y.U.L.Rev. 1090, 1094 (1962).

4. From 1914 through 1964, S & H issued 1120 billion stamps. At the end of 1964 156 billion stamps, worth many millions of dollars, were still outstanding. The Commission found that the record did not permit a determination with certainty of the percentage of stamps never presented for redemption by the public, but concluded that it was probable that redemptions would fall "somewhere between 86 and 95 percent of total stamps issued".

will enhance price and quality competition among stamp companies as to the merchandise they offer for redemption. Obviously, it is to the interest of S & H to prevent trading stamps—here pejoratively entitled "trafficking" in stamps. But, under the language of the Federal Trade Commission Act and Federal Trade Commission v. Brown Shoe Co., 1966, 384 U.S. 316, 86 S.Ct. 1501, 16 L. Ed.2d 587, that interest is irrelevant, if the suppressive practices are unfair methods of competition.

The majority fails to give effect to the broad authority Congress granted to the Federal Trade Commission to protect the public from unfair, anti-competitive business practices. "Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce" are unlawful under Section 5 of the Federal Trade Commission Act. The Act does not define the prohibited unfair methods or practices; they are too numerous, too varied and evolve with the times. Instead, Congress decided that it would be better "by a general declaration [to] leave it to the Commission to determine what practices were unfair". S.Rep. No. 597, 63 Cong.2d Sess. (1914). The House Committee Report is equally positive (H.R.Rep. No. 1142, 63d Cong., 2d Sess. 18–19 (1914):

> It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task.

After both Houses passed the bill, the conference committee changed the phrase "unfair competition" to "unfair methods of competition" to avoid any inference that the Act applied only to those forms of unfair competition which were known at common law. 51 Cong. Rec. 12,145; Federal Trade Commission v. R. F. Keppel & Bros., 1934, 291 U.S. 304, 310–312, 54 S.Ct. 423, 78 L.Ed. 814. Soon after the Federal Trade Commission Act became law the Supreme Court in Federal Trade Commission v. Beech-Nut Packing Co., 1922, 257 U.S. 441, 453, 42 S.Ct. 150, 66 L.Ed. 307, specifically noted that Congress intended the question whether any particular practice was an unfair method of competition to be "determined upon its own facts, owing to the multifarious means by which it was sought to effectuate such schemes."

Moreover, in 1938, with the passage of the Wheeler-Lea Amendment to the Federal Trade Commission, Congress broadened the Commission's authority by authorizing action in protection of the consumer. The House Report stated this Congressional purpose, as follows (H.R.Rep. No. 163, 75th Cong., 1st Sess. p. 3 (1937):

> * * * this amendment makes the consumer, who may be injured by an unfair trade practice, of equal concern, before the law, with the merchant or manufacturer injured by the unfair methods of a dishonest competitor.

The Senate also emphasized the intention of the Amendment to protect the consumer by stating that where acts and practices are "unfair" to the "public generally" they should be stopped "regardless of their effect upon competitors." S.Rep. No. 1705, 74th Cong., 2d Sess. pp. 2–3 (1936). In Federal Trade Commission v. Colgate-Palmolive Co., 1965, 380 U.S. 374, 384, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904, the Supreme Court commented that the Wheeler-Lea Amendment showed Congress' "concern for consumers as well as for competitors." Thus, the Commission may act whenever it uncovers practices which are undesirable or inimical to the public interest.

The Supreme Court has approved of an expansive concept of the Commission's authority to exercise discretion in defining "unfair methods of competition". In *Brown Shoe*, the Court declared, "[T]his broad power of the Com-

mission is particularly well established with regard to trade practices which conflict with the basic policies of the Sherman and Clayton Acts even though such policies may not actually violate these laws." 384 U.S. at 321, 86 S.Ct. at 1504. Section 5 may be used "to arrest trade restraints in their incipiency without proof that they amount to an outright violation of § 3 of the Clayton Act or other provisions of the antitrust laws". 384 U.S. at 322, 86 S.Ct at 1504.

*Brown Shoe* had forerunners. In Federal Trade Commission v. R. F. Keppel & Bro., *supra*, 291 U.S. at 314, 54 S. Ct. 423, 78 L.Ed. 814, the Court remarked that "[n]ew and different 'unfair methods of competition' must be considered as they arise in the light of circumstances in which they are employed." In Federal Trade Commission v. Motion Picture Advertising Service Co., 344 U.S. 392, 394, 73 S.Ct. 361, 363, 97 L.Ed. 426 (1953), the Court noted that in enacting Section 5;

> Congress advisedly left the concept [unfair methods of competition] flexible to be defined with particularity by the myriad of cases from the field of business.

More recently in Pan American World Airways v. United States, 371 U.S. 296, 307–308, 83 S.Ct. 476, 483, 9 L.Ed.2d 325 (1963), the Court reiterated these fundamental principles remarking that:

> * * * "unfair methods of competition" are not limited to precise practices that can readily be catalogued. They take their meaning from the facts of each case and the impact of particular practices on competition and monopoly.

Again in Federal Trade Commission v. Colgate-Palmolive Co., 1965, 380 U.S. 374, 85 S.Ct. 1035, 13 L.Ed.2d 904, the Court noted "the generality of these standards of illegality" stating that "the proscriptions of § 5 are flexible".

*Brown Shoe* has been criticized as raising "issues far beyond the law of exclusive dealing".[5] For example, "Is it consonant with out democratic traditions to permit an administrative agency to refashion statutory standards of legality with no limit except the vague concept of incipiency?"[6] The Commission decision in this case has been said to be "a significant departure from past utilizations of section 5" in that in the past the issue under section 5 has been whether the questioned practice was "a violation of either the language or the spirit of the other antitrust laws".[7] But now, so it is said, the "new standard" is a per se standard and turns "not upon whether the act or practice violates the spirit or letter of the other antitrust laws, but simply upon whether it has an adverse effect upon competition"[8].

I must say that I do not understand what the Court means by asserting that there was no violation of the letter or the spirit of other antitrust laws. The Sherman Act condemns actions "in restraint of trade", but it does not specifically define action in restraint of trade. As a term, "restraint of trade" is as broad as "unfair methods of competition". The "letter" of the Sherman Act is broad enough, without benefit of the "spirit". There should be little doubt that with benefit of the spirit of the Sherman Act, the Commission acted within the scope of Section 5 of the FTC Act. S & H's practices here restrained the trade of retail merchants by depriving them of their freedom to use tools (goods and services for stamps) used by their competitors, the S & H exclusive licensees.[9] S & H did not simply re-

5. Handler, Some Misadventures in Antitrust Policymaking, 76 Yale L.J. 92, 98 (1966).

6. Id.

7. Comment, The Attack on Trading Stamps—an Extended Use of Section 5 of the Federal Trade Commission Act, 57 Georgetown L.J. 1082, 1090.

8. Id. at 1091.

9. The Commission observed that such retailers were not attempting to obtain S & H's "Green" stamps for reissue, but

strain the stamp exchanges in trading: S & H put them out of business.[10]

Second, what S & H argues and what the Court seems to say is that before the Commission may condemn an act as "unfair" it must be an act which previously has been held to violate an antitrust law; otherwise, the Commission is establishing a new per se standard beyond the scope of its delegated authority. But Congress delegated broad powers to the Commission to declare trade practices unfair on a case-to-case approach. The Commission is well aware of this. It started with the premise that trading stamps are not per se unlawful.[11] The Commission then went about its business of examining the facts to determine whether the adverse anti-competitive effects of S & H's practices are substantial enough to require that the public interest in preserving competition take precedence over the business justification for S & H practices. I agree with Commissioner Elman that a broad study and analysis of the trading stamp industry would serve the public interest better than a case-by-case approach.[11] But as I read the legislative history of the Federal Trade Commission Act and the Supreme Court decisions construing it, the Commission did exactly what Congress intended it to do—that is, decide whether S & H's practices were unfair on the facts before it in the light of the public interest. On the record before it,

the Commission properly decided that S & H had engaged in unfair, anti-competitive practices.

I am particularly concerned over the Court's lack of consideration of the consumer's interest. (1) The cost of the stamps is reflected in the retail price structure. Wholly aside from the question whether a trading stamp company may impose restraints on alienability, it seems to me that fairness to consumers requires that they should have the right to dispose of stamps that came to them with their purchases of goods and services. (2) Because of the stamp company's restraints on transfer of stamps along with the uniform practice of requiring 1200 stamps to a book (treated as a unit) the housewife is locked in— tied to the S & H retailer, in order to get the full benefit of the prices she pays. See footnote 3. Thus, the system, for reasons unrelated to the price or quality of products, tends to take away the consumer's freedom of choice to buy in the open market, putting the consumer under the artificial compulsion to deal with a supermarket already enjoying a dominant position. (3) This is a nation on wheels. We have great numbers of migratory workers and citizens who move from city to city. This group of consumers is benefited and the economic waste in unredeemed stamps is reduced, if consumers are able to exchange stamps they receive in one sec-

---

only to attract customers. They were "vying for the patronage of consumers who collected S & H and other trading stamps". The Commission concluded that where a retailer was faced with stamp competition an effective countermeasure might be to offer to exchange or redeem stamps, and that S & H had prevented this type of competitive reaction.

10. The Commission found that S & H had prosecuted a substantial number of suits during the 1957–65 period, and had issued 315 warning letters, all for the purpose of suppressing what S & H regarded as "unauthorized" redemption of its stamps. In virtually all cases, the Commission pointed out, the "firms (many of which were retailers) were forced to

abandon their redemption or exchange practices". The Commission found that the dominance of S & H in the trading stamp field, and the popularity of the S & H "Green" stamp, gave S & H virtual monopoly power over the existence of the small trading stamp exchanges which were unable to operate effectively without S & H stamps. With respect to trading stamp exchanges, the Commission determined that the effect of S & H's activities

* * * tended to eliminate the operations of a whole class of businessmen who provided, or had been providing, a useful and valuable function.

11. Concurring statement of Commissioner Elman.

tion of the country for stamps they receive in another section.[12]

In sum, the record supports the Commission's findings that S & H's suppressive activities have a detrimental effect on consumers and on competition. These effects outweigh the damage to the stamp companies that will be caused by the Commission's order.

One final point: I attach little importance to S & H's success in the courts. That was private litigation. Here, however, the Federal Trade Commission, under a broad grant of authority from Congress, has brought the proceeding in the public interest.

I would affirm and enforce the cease and desist order.

---

12. Many brands of stamps are dispensed mainly in one region, e. g., Blue Chip stamps in California, Frontier stamps in Texas, Stop & Save in the East. The trading stamp exchange enables consumers to trade stamps collected in one location, and not found in the area to which they have moved, for those dispensed and redeemed in the new area.