EASTEX AVIATION, INC.,
Plaintiff-Appellee,

v.

The SPERRY AND HUTCHINSON
CO. et al., Defendants-Appellants.

No. 74–1235.

United States Court of Appeals,
Fifth Circuit.

Nov. 14, 1975.

Donald Scott Thomas, Jr., J. Sam Winters, Austin, Tex., Harold L. Russell, Atlanta, Ga., Claus Motulsky, Dale W. Hagen, New York City, for defendants-appellants.

Jack N. Price, Longview, Tex., for plaintiff-appellee.

Before RIVES, GODBOLD and GEE, Circuit Judges.

GODBOLD, Circuit Judge:

The Sperry & Hutchinson Company [S & H] is in the business of selling its trading stamps, known as Green Stamps, to retailers who use them to attract customers and increase sales. This case raises the question of whether methods which S & H employs in distributing Green Stamps violate § 1 of the Sherman Act[1] under the standards announced in *U. S. v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). The District Court found S & H was violating the antitrust laws and enjoined the unlawful practices. We agree with the District Court's conclusion and affirm.

I

For more than 80 years S & H has been in the trading stamp business. This business involves a three-stage series of transfers of the stamps—"small pieces of gummed paper about the size of postage stamps."[2] First, S & H sells Green Stamps to participating retailers. A retailer may enter into an agreement with S & H whereby S & H agrees to provide him with Green Stamps, promotional advertising signs, and a supply of books to be distributed to and used by customers for the purpose of collecting the stamps. S & H agrees to redeem the stamps when a customer presents them at an S & H redemption center. Also it agrees not to enter into a similar agreement with neighboring competitors of the contracting retailer. In return the retailer agrees to buy Green Stamps from S & H at a specified price, generally approximately $2.65 per 1000 stamps. He agrees to distribute Green Stamps to all customers at the rate of one stamp per 10 cents of merchandise purchased in cash. The retailer is forbidden to sell or distribute Green Stamps in any other manner, except that under some circumstances he may issue additional stamps to a customer. Finally, he agrees to advertise his distribution of Green Stamps and to display the signs supplied by S & H.[3] The sale of stamps by S & H to participating retailers thus involves a variety of subsidiary agreements and restrictions, several of which lie at the center of the present controversy.

The second stage involves a transfer of Green Stamps from retailer to cash customer at the agreed rate of one stamp for each 10 cents of merchandise purchased in cash.[4] The customer pays nothing directly for the stamps he receives.

In the final stage the collector transfers Green Stamps to S & H in exchange for merchandise at one of the redemption centers maintained by S & H throughout its areas of operation.[5] Al-

---

1. 15 U.S.C. § 1 (1970): "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ."

2. *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 236, 92 S.Ct. 898, 901, 31 L.Ed.2d 170, 174 (1972).

3. The terms of the contract are drawn from the contract entered into by defendants Gregg County Aviation, Inc. and S & H. It appears that this is a standard contract.

4. Twelve hundred stamps are needed to fill a book. To fill one book a customer must buy $120 worth of merchandise.

5. At an approximate rate of $3 of merchandise for one book of stamps.

ternatively S & H will give the collector cash for his stamps at a specified rate of exchange. Recent figures indicate that approximately 87% of all Green Stamps distributed by retailers are redeemed.

The operation of S & H's business is demonstrated by the facts of the present case. Defendant Gregg Aviation, Inc. [Gregg] is a "fixed base operator" at the Gregg County Airport, Longview, Texas. It sells to customers such goods and services as aviation gasoline, oil, parts and accessories, flight instructions, charter flights, airplane rentals and mechanical services. Gregg has for several years purchased and distributed S & H Green Stamps pursuant to a contract such as the one described above.

Plaintiff Eastex Aviation, Inc. [Eastex] is also a fixed base operator at the same airport. Eastex and Gregg are thus in direct competition for the same customers. Eastex, determining that Gregg was obtaining a competitive advantage due to its distribution of Green Stamps, contacted S & H in an attempt to become another distributor of Green Stamps. S & H refused to sell stamps to Eastex because Eastex was in a similar business and geographically proximate to Gregg.

Unable to contract with S & H, Eastex employed three schemes to meet Gregg's competition. First it made an agreement to purchase and distribute trading stamps of a competitor of S & H. This was not a successful means of meeting Gregg's competitive advantage, because S & H dominates the trading stamp market in the Longview area and is the only trading stamp company to maintain a redemption center in the area.

Next Eastex offered a cash discount on each sale equal to or greater than the value of the Green Stamps which would be given on such a sale. This also failed, largely because many sales at the airport were to pilots of corporate aircraft who preferred to charge their purchases to their corporate employers and receive Green Stamps which they would retain for themselves.

Eastex's final effort was to purchase stamps from two authorized distributors of Green Stamps, although under the contract employed by S & H it is impermissible for a distributor to sell Green Stamps in bulk to another retailer. S & H learned of Eastex's supply of stamps, traced the sources, and threatened to terminate its agreements with the supplying retailers if they continued to sell stamps to Eastex. Both sources then discontinued sales of Green Stamps to Eastex.

Unsuccessful in its attempts to meet Gregg's competition, Eastex brought this suit seeking an injunction forbidding S & H to refuse to license it as a distributor of Green Stamps or, alternatively, forbidding S & H to interfere with any of its licensees who wish to resell stamps to plaintiff. S & H counterclaimed, seeking an injunction preventing Eastex from interfering with S & H's contractual relationships with licensees by encouraging them to sell stamps to Eastex. The District Court held that S & H was free to refuse to license Eastex but that S & H's restrictions on resale of Green Stamps were in violation of § 1 of the Sherman Act as interpreted in *Schwinn, supra*. The court enjoined S & H from conditioning its dealings with licensees upon their making no resales of stamps to Eastex. Relief was denied on the counterclaim since it sought protection of S & H's rights under an illegal agreement.

## II

We reject S & H's threshold contention that its methods of restricting resale of Green Stamps were approved by this court in *Sperry and Hutchinson Co. v. FTC*, 432 F.2d 146 (CA5, 1970), *aff'd, modified* and *remanded,* 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). The issue before us was not reached in that case.

In 1965 FTC issued a complaint alleging that the S & H engaged in unfair methods of competition and unfair acts and practices in commerce in violation of

§ 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. The Commission ultimately concluded that S & H was involved in illegal combinations or conspiracies and was pursuing illegal unilateral practices and issued an order proscribing unilateral practices of S & H including its attempts to halt trafficking in Green Stamps. Trafficking involved the operation of trading stamp exchanges where stamps of various companies could be purchased, sold or exchanged, and the operation of retail businesses offering discounts on sales of merchandise when the customer partially paid for the merchandise with Green Stamps. S & H feared that this trafficking would reduce the demand for its stamps from authorized distributors and consequently injure its sales of Green Stamps. The FTC found that S & H's efforts to stop trafficking constituted an unfair trade practice, and a portion of its order enjoined such efforts.[6] It was solely from this portion of the order that S & H appealed.

On appeal this court held that the Commission has the power to declare unfair only practices which fall in one of three categories: "(1) a per se violation of antitrust policy; (2) a violation of the letter of either the Sherman, Clayton, or Robinson-Patman Acts; or (3) a violation of the spirit of these Acts as recognized by the Supreme Court of the United States." 432 F.2d at 150 (footnote omitted). We then concluded that the anti-trafficking practices at issue did not fall within any of these classes and, accordingly, that the FTC had exceeded its authority in issuing its order concerning these practices.

The Supreme Court granted certiorari and on appeal held that this court had erred in its narrow reading of the FTC's authority, but, nevertheless, affirmed its judgment vacating the Commission's order. That order reflected the FTC's determination that S & H was violating the letter and spirit of the antitrust laws. Since the FTC on appeal to the Supreme Court did not challenge the Court of Appeal's contrary determination that S & H's anti-trafficking practices did not violate the letter and spirit of the antitrust laws,[7] the Court held the FTC's order was properly vacated.

For two reasons *S & H v. FTC* has no bearing on the present case. First, the practices of S & H at issue in that case—anti-trafficking—were different from those in the present case—preventing non-licensed retailers from distributing Green Stamps. Although there is language in the court of appeals decision indicating that the issuing of Green Stamps by unlicensed retailers was included in the trafficking at issue,[8] the opinions of both this court and the Supreme Court indicate that the FTC was attacking S & H's practices regarding stamp exchanges and retailers who redeemed Green Stamps.

Second, the question of whether S & H's resale restrictions were in violation of *Schwinn* was specifically left undecided by the FTC and was not at issue before this court when we held that S & H was not violating the letter or spirit of the antitrust laws:

> The Commission did explicitly decline to assess S & H's conduct in light of one leading antitrust case [*Schwinn*] . . . ..

---

**6.** The relevant portions of the order were described by this court on appeal:

> "Portions of the order . . . directed S. & H. to cease and desist from preventing persons from trafficking in its trading stamps. S. & H. was also ordered not to institute suits to enjoin such trafficking and to notify traffickers that injunctions presently in effect in state and federal courts would not be enforced."

432 F.2d at 148.

**7.** The Supreme Court specifically stated that it "intimate[d] no opinion" on the issue of whether S & H's anti-trafficking practices violated the letter or the spirit of the antitrust laws. 405 U.S. at 239, 92 S.Ct. at 903, 31 L.Ed.2d at 176.

**8.** In discussing the traffickers of the stamps this court noted: "Some retailers have attempted to acquire S. & H. stamps from some source other than S. & H. in order to issue them to their own customers." 432 F.2d at 149.

Arguably, S & H's practice is proscribed by this doctrine. When the FTC declined to rely on this precedent, however, it did so not to turn to considerations other than those embedded in the antitrust laws, but instead to look for considerations less "technical" and more deeply rooted in antitrust policy[.]

405 U.S. at 247, 92 S.Ct. at 907, 31 L.Ed.2d at 181 n. 6.

Thus *S & H v. FTC* is not *stare decisis* for the issue before us.

### III

*Schwinn* involved the practices of a large bicycle manufacturer in controlling the distribution and sale of bicycles through regional distributorships and retailers. Schwinn's method of doing business, like S & H's, involved a strict set of resale restrictions. To distribute and sell its bicycles to retailers Schwinn used 22 wholesale distributors of two classes: (1) distributors who would buy from Schwinn and resell to retailers, and (2) distributors who were agents or consignees for Schwinn and would sell to retailers bicycles which were still the property of Schwinn. Each of these distributors was given the exclusive right to sell Schwinn bicycles to retailers in a particular territory and was forbidden from selling to any retailer outside of its territory. Most importantly, each distributor was permitted to sell bicycles only to authorized Schwinn dealers in its territory, and, correspondingly, authorized Schwinn dealers could purchase Schwinn bicycles only from the distributor for their locale. Thus Schwinn maintained total control of where and to whom the distributors sold Schwinn bicycles.

Schwinn's control of resale of bicycles also was exercised at the retail level. Retailers were forbidden from selling Schwinn bicycles to other retailers not authorized by Schwinn. This restriction, in combination with the resale restrictions on distributors, gave Schwinn almost total control of the route its bicycles would follow as they were transferred from Schwinn to distributor to retailer to consumer.

The Supreme Court emphatically concluded that Schwinn's practices were unlawful:

As the District Court held, where a manufacturer *sells* products to his distributor subject to territorial restrictions upon resale, a per se violation of the Sherman Act results. And, as we have held, the same principle applies to restrictions of outlets with which the distributors may deal and to restraints upon retailers to whom the goods are sold. Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it . . .. Such restraints are so obviously destructive of competition that their mere existence is enough.

388 U.S. at 379, 87 S.Ct. at 1865, 18 L.Ed.2d at 1260. The Court, however, distinguished the situation where the manufacturer retains an interest in the product:

Where the manufacturer retains title, dominion, and risk with respect to the product and the position and function of the dealer in question are, in fact, indistinguishable from those of an agent or salesman of the manufacturer, it is only if the impact of the confinement is "unreasonably" restrictive of competition that a violation of § 1 results from such confinement, unencumbered by culpable price fixing.

388 U.S. at 380, 87 S.Ct. at 1866, 18 L.Ed.2d at 1261. The Court therefore concluded that a per se rule applied where bicycles were sold and a reasonableness rule applied where the manufacturer retained certain interests in the bicycles.

Eastex contends and the District Court ruled that S & H's sale of Green Stamps falls within the literal language of *Schwinn*'s per se rule and therefore S &

H's distribution limitations, without any showing of unreasonableness, violate the antitrust laws. To escape the per se rule of *Schwinn*, S & H counters with essentially five arguments, which we now discuss.

### 1. *S & H's practices are to be judged by the rule of reason test also set out in Schwinn.*

The Court in *Schwinn*, after setting forth the per se rule, stated that the rule of reason applies where the manufacturer retains (1) title, (2) dominion and (3) risk of loss with respect to the product and (4) the retailer essentially functions as an agent or salesman of the manufacturer. 388 U.S. at 380, 87 S.Ct. at 1866, 18 L.Ed.2d at 1261. S & H fails in its contention that it meets these four requirements and is therefore subject to a standard of unreasonableness.

■ S & H claims that it explicitly retains title to the Green Stamps under its contract with the licensee, which provides:

> The property in and title to the Stamps . . . shall at all times remain in the Licensor [S & H] and shall not pass to the Licensee or to any other person, firm or corporation.

Since S & H fails to meet other requirements we pretermit entering into an elaborate property law discussion of whether S & H has retained "title" to stamps it has issued to retailers. The term "title" essentially is a group symbol "denoting a 'bundle' of rights or other legal relations." *Standard Oil Co. v. Clark,* 163 F.2d 917, 930 (CA2, 1947), *cert. denied,* 333 U.S. 873, 68 S.Ct. 901, 92 L.Ed. 1149 (1948). It is apparent that S & H divests itself of substantial rights in Green Stamps when they are issued, so that the statement concerning retention of title is only formalistic.[9]

■ With respect to "dominion", a generally accepted definition adopted, for example, by the Texas courts, is "perfect control in right of ownership." *Bledsoe v. Fitts,* 47 Tex.Civ.App. 578, 105 S.W. 1142 (1907) (and cases cited therein). See also Black's Law Dictionary 573 (4th ed.Rev.1968). Dominion implies both title and possession and appears to require complete retention of control over disposition. When S & H transfers Green Stamps to retailers its control over subsequent disposition of the stamps necessarily diminishes and vanishes entirely when they are disbursed to buyers. While S & H may contractually control the issuance of stamps in accordance with an agreed-upon rate, it does not retain complete control of the manner of distribution. Retailers may decide, independently of S & H, to issue additional stamps if the consumer buys a specified product, makes purchases of a specified amount or otherwise complies with advertised conditions. Whether Green Stamps ultimately return to S & H for redemption rests within the sole discretion of the buyer who acquires possession, and during his possession S & H has no vested rights of ownership or reacquisition. In addition, *Schwinn* recognized that "once the manufacturer has parted with title and risk he has parted with dominion over the product." 388 U.S. at 382, 87 S.Ct. at 1867, 18 L.Ed.2d at 1262.

S & H obviously fails to meet the *Schwinn* risk of loss requirement. If the Green Stamps are lost or destroyed while in the possession of retailer or consumer, only the possessor loses. S & H does not lose; indeed, it benefits since it will never have to redeem the lost stamps. S & H's argument that it retains the risk of loss with respect to the merchandise in its warehouses is irrelevant. Nobody disagrees that S & H retains title, dominion and risk of loss with respect to that property. The issue, however, is

9. *Cf.* Uniform Commercial Code § 2–401, under which a seller's retention of title in

shipped or delivered goods is limited in effect to a reservation of a security interest.

the retention of these interests in the stamps themselves.

It is unnecessary for us to resolve the extent to which the retailer is an agent of S & H.[10]

### 2. Green Stamps are not goods and therefore do not fall within Schwinn.

■ Arguing that Green Stamps are intangibles, S & H contends that *Schwinn* is inapplicable. Initially we have difficulty with the premise that a trading stamp is an intangible. The Supreme Court has viewed money as a tangible commodity[11] and similarly we think that Green Stamps have characteristics similar to other commodities. S & H is not providing simply a service. It distributes articles of value which undergo a series of transfers.

■ Assuming that Green Stamps are intangible in a sense that bicycles are not, there is nothing in *Schwinn* to indicate that it is limited to tangible goods. The Supreme Court has indicated that the antitrust laws extend to a wide variety of services as well as goods. For example in *Fortner Enterprises v. U.S. Steel Corp., supra*, the Court rejected the defendant's argument that "credit" should be treated differently than other goods and services. See 394 U.S. at 508–509, 89 S.Ct. at 1261–1262, 22 L.Ed.2d at 507–509. See also *U. S. v. National Ass'n of Real Estate Boards*, 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007 (1950); *U. S. v. New Wrinkle, Inc.*, 342 U.S. 371, 72 S.Ct. 350, 96 L.Ed. 417 (1950); *U. S. v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

Finally, even if Green Stamps are intangibles and bicycles are tangibles, S & H does not tell us why this difference in classification has any significance in the field of antitrust law.

### 3. S & H has a possibility of reverter and therefore Schwinn is inapplicable.

■ S & H contends that the *Schwinn* per se rule was based on the rule against restraints on alienation. It claims that there is a possibility of reverter to it which brings it within an exception to the rule against restraints on alienation, and thus outside the intended scope of *Schwinn*.

This argument fails for two reasons. First, S & H does not have a reversionary interest or possibility of reverter in the Green Stamps. The Restatement defines a reversionary interest as "any future interest left in a transferor or his successor in interest." Restatement of Property, § 154, p. 525.[12] S & H has no future interest in Green Stamps that it has transferred. A future interest is "a segment of ownership measured in terms of duration." Restatement of Property, § 153, p. 520. Whether S & H ever reacquires the Green Stamps is wholly dependent on the consumer's redeeming the stamps. This possibility of reacquisition is not a segment of ownership measured in terms of duration. See Restatement of Property, § 153, comment c. S & H's argument fails as a matter of property law.

■ Second, although *Schwinn* mentions the rule against restraints on alienation as one of the bases for its decision, the foundation for the rule there enunciated is far broader. Ancient rules of property law should not be made the basis for determining the application of modern rules of antitrust law. Consideration of Congressional intent and the public interest should control.

---

**10.** The retailer has characteristics of an independent businessman (he purchases the stamps and depends on increased sales or increased prices to cover his additional costs) as well as of an agent (as a sort of middleman, he distributes stamps which involve obligations and rights between S & H and the consumer).

**11.** *Fortner Enterprises v. U.S. Steel Corp.*, 394 U.S. 495, 508, 89 S.Ct. 1252, 1261, 22 L.Ed.2d 495, 508 (1969).

**12.** A possibility of reverter is simply a reversionary interest which is subject to a condition precedent.

#### 4. Decisional exceptions to Schwinn.

S & H points to recent case law holding *Schwinn* inapplicable in a variety of circumstances. Four exceptions have developed in *Schwinn*'s progeny.[13] Assuming each is valid as a matter of law, none is applicable to the present case.

In *Tripoli Co. v. Wella Corp.,* 425 F.2d 932 (CA3), *cert. denied,* 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970), the Third Circuit held that a manufacturer of beauty supplies could require wholesalers to sell its products only to retailers who were professional beauticians and barbers. The court found that this resale restraint was reasonable due to the health hazards which could arise if unlimited distribution were permitted.[14] The rule of reason has been applied where a manufacturer has required wholesalers to sell its product for less if the product is put to certain types of uses by the purchaser. *Carter-Wallace v. U. S.,* 449 F.2d 1374, 196 Ct.Cl. 35 (1971). See also *Paddington Corp. v. Major Brands, Inc.,* 359 F.Supp. 1244 (W.D.Okl., 1973). Neither of the foregoing exceptions applies to S & H.

*Mississippi Valley Gas Co. v. FPC,* 398 F.2d 395 (CA5, 1968), cited by appellant as an exception to *Schwinn,* is not an anti-trust case. In that case we reviewed and affirmed the Federal Power Commission's issuance of a certificate of public convenience and necessity enabling a natural gas supplier to sell gas directly to a customer located in a distributor's area of service. A provision of the supplier's tariff required distributors to obtain approval from the supplier before contracting for industrial resales in excess of stated volumetric limitations. Asserting that the FPC's determination should consider *Schwinn,* the distributor, "while not asking this Court to decide

that [the supplier] had violated the antitrust laws," suggested that its "conduct [was] so wrongful that it should not enjoy the fruits of its misconduct." 398 F.2d at 398. Rejecting the contention, we declined to employ *Schwinn* in this tangential manner to erode the FPC's well-supported findings that the tariff restriction was not itself unreasonable and that it was not "based on predatory motives, but on a valid desire by [the supplier] to protect itself and its customers from unreasonably large demands by one customer." *Id.* This refusal is not authority for S & H in the present case.

Finally, several cases find the per se rule inapplicable since the resale restrictions imposed by the manufacturer are not firm and resolute. *Janel Sales Corp. v. Lanvin Parfums, Inc.,* 396 F.2d 398 (CA2), *cert. denied,* 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275 (1968); *Weather Wise Co. v. Aeroquip Corp.,* 468 F.2d 716 (CA5, 1972), *cert. denied,* 410 U.S. 990, 93 S.Ct. 1505, 36 L.Ed.2d 188 (1973); *Colorado Pump & Supply Co. v. Febco, Inc.,* 472 F.2d 637 (CA10), *cert. denied,* 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965 (1973). See also *Beverage Distributors, Inc. v. Olympia Brewing Co.,* 440 F.2d 21 (CA9), *cert. denied,* 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682 (1971). S & H's resale restrictions are firm and resolute. It has consistently followed a policy of enforcing them.

We therefore conclude that none of the post-*Schwinn* decisional exceptions applies.

#### 5. Destruction of S & H's business.

S & H urges that *Schwinn* should not be applied because to do so will undermine and possibly destroy its business. Its principal support is the argument that the essence of the trading stamp industry is the monopoly granted to li-

13. This court, analyzing the opinion in *Schwinn,* has noted that two other exceptions may exist: the "new entrants" exception and the "failing companies" exception. *See Copper Liquor, Inc. v. Adolph Coors Co.,* 506 F.2d 934, 940–43 (CA5, 1975). For a discussion of the exception *see* Comment, Exceptions to Schwinn's Per Se Rule: Their Validity and Im-

plications for the Future, 31 Wash. & Lee L.Rev. 643 (1974).

14. This exception has not been universally accepted. *See U. S. v. Glaxo Group Ltd.,* 302 F.Supp. 1 (D.D.C., 1969), rev'd on other grounds, 410 U.S. 52, 93 S.Ct. 861, 35 L.Ed.2d 104 (1973), applying the *Schwinn* per se rule in the face of an identical argument.

censees, and if all retailers are free to obtain stamps the value to a licensee of being the exclusive distributor of Green Stamps will disappear.

The Supreme Court and this court have indicated great reluctance to engraft exceptions on the *Schwinn* per se rule:

> Many manufacturers may assert a claim of uniqueness with respect to their products, and in good faith believe that they would be "driven out of business" without the restraints in question. . . . The core facts of this case suggest caution in assessing a manufacturer's assertion that a marketing restriction with demonstrable anticompetitive effects is necessary to its "survival".

*Copper Liquor, Inc. v. Adolph Coors Co.,* 506 F.2d 934, 947 (CA5, 1975). The Supreme Court recently rejected the claims of an association of regional supermarket chains that certain resale restrictions on goods purchased by the association were essential to insure the ability of association members to compete with large national chains. *U. S. v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). The Court held that although there may be some inter-brand competitive benefits derived from the resale restrictions, attempts to limit intra-brand competition, whether in the form of customer or territorial restrictions, are subject to the per se rule and are invalid.

This circuit similarly rejected claims of special equities in *Copper Liquor, supra.* A beer manufacturer contended that special care and treatment required for its beer prior to delivery to the consumer necessitated territorial resale restrictions. This court noted that "[t]he present case presents a tempting invitation" to engraft an exception from the *Schwinn* per se rule, but concluded that "the present record would not support the conclusion that the vertically imposed territorial restrictions are essential to the integrity of Coors' product to the survival of the firm." 506 F.2d at 944.

We concluded that the resale restrictions constituted a violation of the *Schwinn* per se rule. The Tenth Circuit has reached the same conclusion. *Adolph Coors Co. v. FTC,* 497 F.2d 1178 (CA10, 1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975).

With these cases as background, we are unable to agree with S & H's assertions of its exceptional needs. It is not apparent that S & H will be unable to continue business in essentially its present form.

Grocery store A may now pay S & H a premium for Green Stamps because its competitor B is unable to offer Green Stamps. A's monopoly as a distributor of Green Stamps will, in theory, draw increased customers and the greater sales will make the right to offer Green Stamps more valuable to A. But A may still desire to offer Green Stamps although it is not a monopoly offeror. Customers will continue to want Green Stamps whether one or more than one store in the neighborhood distributes them. A or B will seek to satisfy this demand. It is true that A may not be willing to pay the premium he paid S & H when he was the only distributor, but he may still be willing to pay a sum determined by the magnitude of customer demand.

The economics underlying the trading stamp business are not obvious.[15] Rather than presenting evidence concerning the operation of its business and the special economics involved, S & H chose to rely on pre-*Schwinn* case law involving trafficking in Green Stamps and its unsupported assertions concerning the trading stamp business. The record does not support the contention that resale restrictions are essential to the survival of S & H's business, or even that, without resale restrictions, consumers and retailers will not continue to demand Green Stamps in amounts and prices comparable to previous years.[16]

Affirmed.

**15.** The business is discussed in Comment, Trading Stamps, 37 N.Y.U.L.Rev. 1090 (1962).

**16.** Our conclusion is bolstered by evidence below indicating that S & H has at times deviat-

GEE, Circuit Judge (specially concurring):

I concur in the result reached by the majority. Unless I have misread it, however, I cannot entirely accept the basic reasoning of the majority opinion. This I take to be that since *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), establishes as a per se rule that a vendor's maintenance of any control whatever over the marketing of articles which he has *sold*[1] constitutes a violation of Section One of the Sherman Act,[2] with certain possible exceptions, it is up to a defendant who has been shown to maintain such control to prove himself into one of these perhaps-exceptions or lose.

I doubt this is the whole story. It seems to me that it should also be open to a defendant to go forward, especially in situations where—as here, and as the majority correctly notes—the economics are "not obvious" to show that his total economic picture is not analogous to that of *Schwinn* and a wooden application of *Schwinn*'s per se rule to him would be inappropriate.[3] I do not think there is much help in arguments about how much trading stamps are like or unlike

bicycles; more may be expected from a comparison of the operation and particular economics of one business with those found in *Schwinn,* and more yet from a thorough presentation of proof on the issue of whether the practice attacked actually operates, in context, in an anti-competitive fashion. Asked to apply a per se rule in a somewhat different context, the Eighth Circuit has been careful, post-*Schwinn,* to afford such an opportunity in the occult economic setting of bank credit cards.[4] Pre-*Schwinn,* the Supreme Court did likewise in *White Motor Co. v. United States.*[5]

But both of these decisions were reversals of summary judgments, each entered below on the assumption that a per se rule should apply to defendant's situation and without a trial opportunity for defendant to present evidence why it should not, in order to give him that chance. Here defendant has had his chance to go forward with such proof and missed it. And though the last paragraph of the majority opinion remarks this circumstance, I wish to state plainly that for me it is this failure to go forward which is dispositive and not defendant's inability to find a lodgment in one of *Schwinn*'s perhaps-illusory crevices.

---

ed from its generally applied resale restrictions. Near the airport involved more than one gasoline service station in the same neighborhood has been licensed to distribute Green Stamps. S & H made no showing that the sale of stamps to those stations resulted in significantly smaller revenues.

1. In such a sense as to have parted with ". . . all indicia of ownership, including title, dominion and risk." 388 U.S. at 381, 87 S.Ct. at 1866.

2. On stated reasoning that permitting even reasonable restrictions on resale ". . . where the manufacturer has parted with dominion over the goods . . . would violate the ancient rule against restraints on alienation. . . ." 388 U.S. at 380, 87 S.Ct. at 1866. The "ancient rule" apparently derived by deduction from a given concept of property rights, alienability being one such right and its withholding inconsistent with a "sale," and perhaps in part from Quia Emptores' purpose to deter subinfeudation and so conserve the

prerogatives of the great feudal magnates. The Sherman Act seems to rest on somewhat different bases.

3. Our opinion in *Copper Liquor, Inc. v. Adolph Coors Co.,* 506 F.2d 934 (5th Cir. 1975) merely takes a very literal interpretation of *Schwinn* when vertical restrictions are coupled with price fixing; it does not foreclose such a treatment of *Schwinn.* Id. at 941–45.

4. *Worthen Bank & Trust Co. v. National Bankamericard, Inc.,* 485 F.2d 119 (1973).

5. 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). It is possible to view *Schwinn* as a mere application of *White Motors* to a particular situation where the economics are plain, with others to be dealt with on a case-by-case basis. Indeed it is tempting to do so, for so we are rescued from attempts to compare bicycles with trading stamps, credit cards, etc. But the Court's language probably indicates an intent to sweep more broadly than this.